UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY | ) | Case No. 1:10-cv-00161-JHM-ERG |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY DEWAYNE POYNTER, ET AL | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |
| PBI BANK, INC., ET AL | ) | |
| | ) | |
| THIRD-PARTY PLAINTIFFS | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GLASGOW INSURANCE AGENCY, INC., ET AL | ) | |
| | ) | |
| THIRD-PARTY DEFENDANTS | ) | |

---

**PLAINTIFF'S GREAT AMERICAN INSURANCE COMPANY, RESPONSE TO
DEFENDANT'S, PBI BANK, INC., MOTION FOR SUMMARY JUDGMENT**

---

Comes the Plaintiff, Great American Insurance Company (""Great American"), by counsel, and for its response to PBI Bank, Inc.'s ("PBI") motion for summary judgment states as follows:

**<u>INTRODUCTION</u>**

This case involves various claims of fraud against PBI, among other parties, arising from sham loans provided by PBI to Poynter Construction Company ("Poynter Construction") and/or Anthony Poynter ("Poynter") to allow Poynter Construction to state that it had met certain capital requirements in order to induce Great American to issue various bid, performance and payment bonds on behalf of Poynter Construction. PBI acknowledges that it made the loans

under what Dennis Wilcut ("Wilcutt"), the community bank president, acknowledges were unusual terms.  Rather, PBI claims that neither it nor Wilcutt can be held responsible how Poynter used the loans because they did not know of his wrongful conduct.  However, that claim ignores that PBI and Wilcutt had extensive knowledge of the transactions involved, how Poynter intended to use the loans, that Wilcutt made false statements in furtherance of the fraud, and that PBI prepared false documents, among numerous other things.  PBI also contends any false statements that were made did not caused Great American's losses because Great American did not rely on the statements and the losses were actually caused by Great American's underwriting.  However, as discussed in more detail below, Great American's reliance on Poynter's and Poynter Constructions capital positions, which were misrepresented with the assistance of PBI and Wilcutt, induced Great American to issue the bonds and resulted in Great American's loss.

## COUNTER STATEMENT OF THE FACTS

### I.      GREAT AMERICAN'S BONDING OF POYNTER CONSTRUCTION

Mark McDaniel ("McDaniel") is employed by Great American in Louisville, Kentucky and manages bond work in the Louisville area.  (*McDaniel* Depo Page 12, Lines 12 – 15 attached hereto as Exhibit "A")  He manages about 200 active accounts and supervises two underwriting staff and two customer representatives.  (*McDaniel* Depo Page 12, Lines 12 – 15)  McDaniel made the decisions on whether to issue the bonds at issue in this case to Poynter Construction. (*McDaniel* Depo Page 12, Lines 24 – Page, Line 4)

When a party requests a surety bond from Great American, McDaniel will initially request three years of financial records.  (*McDaniel* Depo Page 15, Lines 5- 8 and Lines 19-22). Great American generally requests three years of financials because it gives a better idea of the trending capacity of the contractor and allows the underwriter to better assess the contractor's

bond worthiness. (*McDaniel* Depo Page 16, Lines 15 – 21). However, in the case of Poynter Construction, he initially relied primarily on the December 31, 2007 financial statement when issuing bonds because Poynter Construction was a new company beginning its start into the commercial construction business. (*McDaniel* Depo Page 17, Lines 20 – 25; Page 18, Line 15). McDaniel received the December 31, 2007 financial statement on January 28, 2008. (*McDaniel* Depo Page 21, Lines 7 – 11).

The December 31, 2007 financial statement, which was completed on January 25, 2008, indicates that Poynter Construction had $503,565.00 of cash in its bank account. (*Fields* Depo Page 25, Line 21 – Page 26, Line 6 attached hereto as Exhibit "B"; *December 31, 2007 Financial Statement* and Poynter Construction Adjusted Trial Balance Prepared by Fields attached hereto as Exhibit "C"). That amount includes the proceeds of a loan from PBI Bank to Poynter Construction in the amount of $500,000.00. When the accountant obtained the general ledger from Poyner Construction, it included a note payable from Poynter Construction to PBI Bank in the amount of $500,000.00, which acted as a debt against Poynter Construction's cash balance. However, the accountant reclassified the note payable as additional paid-in-capital based on representations from PBI Bank. (*Fields* Depo, Page 28, Line 5 – Page 29 Line 23; December 31, 2007 Financial Statement). Specifically, the note payable was treated as being payable from Poyner personally to PBI Bank, thereby taking the note off Poynter Construction's books, based on a January 2, 2008 letter from Wilcutt stating:

> This letter is to verify and confirm that Dewayne Poynter, injected $500,000.00 into Poynter Construction account and that Poynter Construction has no debt at PBI Bank-Glasgow.

(*Fields* Depo Page 29 Line 23 – Page 30, Line 16)(*See also* January 2, 2007 letter from Wilcutt attached hereto as Exhibit "D") This statement by Wilcutt was and is false. Wilcutt held the

position of Community President at PBI for the Glasgow, Barren County area and participated in providing the loans to Poynter Construction. (*Wilcutt* Depo, Page 9, Line 16 – Line 19 attached hereto as Exhibit "E"; Loan Documents for December 31, 2007 loan attached hereto as Exhibit "F"; Loan Documents for December 31, 2008 loan attached hereto as Exhibit "G")  However, the reality of the situation was that Poynter Construction took out a $500,000.00 "loan" from PBI, the proceeds of that "loan" were placed into a blocked account at PBI Bank on December 31, 2007 at 10:49 a.m. to which Poynter Construction had no assess, the maturity date on the loan was January 2, 2008, and then those same proceeds were used to pay off the note on January 2, 2008 at just after 8:30 a.m (meaning the funds were not even in the account for a full day while the bank was open). (Wilcutt, Depo, Page 66, Line 16 – Page 71, Line 2)

Wilcutt acknowledged that he was aware that $500,000.00 loan was being used to inject capital into Poynter Construction for the purpose of allowing Poynter Construction to obtain bonds, that Poynter Construction was bidding certain construction projects and that those projects required bonds. (*Wilcutt* Depo, Page 86, Line 6 – Page 87, Line 5)  In fact, Wilcutt acknowledged receiving a letter dated December 4, 2007 from Poynter stating that he needed a loan in the amount of $500,000.00 to inject into to Poynter Construction to give him bonding capacity of about $5,000,000. (*Wilcutt* Depo, Page 60, Line 12 – Page 61, Line 2).  Furthermore, Wilcutt acknowledged that he prepared the letter quoted above stating that Poynter Construction injected $500,000.00 into a Poynter Construction's account and confirming that Poynter Construction had no debt to PBI Bank because Poynter "had to have proof he made a deposit." (*Wilcutt* Depo, Page 74, Line 18)  The loan documents for the December 31, 2007 loan indicate that it was to be paid on January 2, 2008. (*See* Exhibit "F")  The loan documents indicate that the loan was for a revolving line of credit for a term of 12 days, which Wilcutt acknowledged he

4

had not likely previously done in all of his years of banking.  (Exhibit "F"; *Wilcutt* Depo, Page 55, Line 12 – Line 21)  Wilcutt was also not aware that he had ever made a loan prior to the December 31, 2007 in which there was a requirement that it be placed in the blocked account. (*Wilcutt* Depo, Page 61, Line 5 – Line 10)

After receiving the December 31, 2007 financial statement, which indicates that Poynter injected the $500,000.00 referenced in the previous paragraphs, McDaniel was asked and did issue a number of bonds on behalf of Poynter Construction.  The bonds issued by McDaniel included the bonds on the Barren-Metcalfee County EMS project, which were issued in April of 2008. (*McDaniel* Depo, Page 29, Line 20 – 22).  McDaniel relied heavily on the December 31, 2007 financial statement when issuing the bonds on the Barren-Metcalfee County EMS project. (*See McDaniel* Depo Page 17, Lines 20 – 25; Page 18, Line 15).

When McDaniel received the June 30, 2008 financial statement for Poynter Construction, he became concerned because he learned the $500,000.00 that had been "injected" into the Poynter Construction was no longer in Poynter Construction.  (*See McDaniel* Depo Page 31, Lines 6 – Line 9).  The first time that McDaniel knows for certain that he received the June 30, 2008 financial statement was on October 1, 2008.  After learning that the $500,000.00 was no longer in the company, McDaniel continued to issue bonds based on the condition that the $500,000.00 that he believed had previously been injected into Poynter Construction be put back into the company.  (*McDaniel* Depo Page 32, Lines 22 – 24).  McDaniel believed that it would not be an issue for Poynter to place the $500,000.00 back into Poynter Construction, because he believed that Poynter's grandparents, the Alexanders', were backing him and because Poynter had the $500,000.00 at December 31, 2007 which was apparently subsequently distributed to Poynter.  (*McDaniel* Depo Page 32, Lines 11 – 21; Page 33, Line 17 – Page 33, Line 23)

Although McDaniel received the June 30, 2008 interim financial statement, he continued to rely on the December 31, 2007 financial statement as indicating that Poynter had the financial capacity to place $500,000.00 of capital into Poynter Construction.  That is one reason why he was willing to continue to issue bonds on the condition that the $500,000.00 would be placed back into Poynter Construction.  (*McDaniel*, Affidavit, ¶ 9-11 attached hereto as Exhibit "H")

On November 10, 2008, McDaniel approved issuance of a bid bond for the City of Oak Grove Project on the condition that Poynter put the $500,000.00 back into Poynter Construction.  Poynter Construction was the low bidder on the city of Oak Grove Project, and McDaniel approved the final bonds on the project on or about December 1, 2008 with the same condition as to the $500,000.00.  At the time that McDaniel approved those bonds, it was represented to him that Poynter agreed to capitalize Poynter Construction in the amount of $500,000.00 before the year-end 2008.  (*McDaniel*, Affidavit, ¶ 9)  Because the December 31, 2007 financial statement stated that the $500,000.00 was Additional Paid-in-Capital, and the June 30, 2008 interim financial statement stated that the $469,196.00 decrease in capital was a capital distribution to Poynter, McDaniel believed that Poynter would simply be placing the funds that he had distributed from Poynter Construction back into Poynter Construction.  (*McDaniel*, Affidavit, ¶ 10)  If the December 31, 2007 financial statement had not stated that Poynter had Additional Paid-in-Capital in the amount of $469,196.00, McDaniel would not have issued the bonds on the City of Oak Grove project on the condition that the $500,000.00 be put back into the company.  McDaniel relied on financial condition of Poynter Construction stated in the December 31, 2007 financial statement when he approved those bonds.  (*McDaniel*, Affidavit, ¶ 11; *see also McDaniel*, Depo, Page 30, Line 23 – Page 33, Line 23)

On December 2, 2008, McDaniel had a meeting with the new CPA, Bobby Cherry, the agent, Harrdison, and Poynter at which time the capital requirements were discussed. (*McDaniel* Depo Page 36, Line 10 – Page 37, Line 19)  At that meeting, McDaniel informed Poynter and the other parties involved that based on the requested bonding requirements for Poynter Construction for 2009 that Poynter would have to capitalize Poynter Construction with $1 million. (*McDaniel* Depo Page 36, Line 10 – Page 37, Line 19).  McDaniel agreed that it was acceptable to capitalize using a loan as opposed to paid-in-capital.  However, he required that the loan be for at least a period of 13 months, it could not have a corporate guarantee on the note from Poynter Construction, the note had to be payable by Poynter personally, and the Poynter's interests in being repaid by Poynter Construction had to be subordinated to Great American's right to receive payment. (*McDaniel* Depo Page 124, Line 24 – Page 125, Line 18).  Poynter Construction would only be able to pay Poynter for interest on the note. (*McDaniel* Depo Page 125, Line 10 – Line 21)

Shortly after the December 2, 2008 meeting, around Christmas time, McDaniel received a phone call from Wilcutt to confirm the terms that were required to be in the note. (*McDaniel* Depo Page 129, Line 20 – Page 130, Line 22)  Wilcutt had a good understanding of what terms were required in the note based on conversations with Poynter, but McDaniel explained the terms he had given to Poynter. (*McDaniel* Depo Page 130, Line 1 – Line 22; *see Poynter* Depo Page 34, Line 24 – Page 35 Line 7 (May 12, 2010) (where Poynter states that Wilcutt spoke to McDaniel about the terms for the December 2008 loan))  Wilcutt represented to McDaniel that the loan could and would be issued under those terms. (*McDaniel*, Affidavit, ¶ 15).

However, at the time that he had the conversation with McDaniel about the structure of the loans and indicated that the same could and would be completed, Wilcutt knew that the loans

would not be completed in that manner.  The only application prepared by Wilcutt for the December 2008 loan showed the term of the loan as being until only January 26, 2009, less than a month after the loan was to be issued.  (*Wilcutt* Depo, Page 76, Line 25 – Page 77, Line 25; Exhibit "G")  Furthermore, with respect to the 2007 loan, he stated that the money had to be placed in to the blocked account to protect the interests of the Alexanders' who were acting as guarantors.  (*Wilcutt* Depo Page 44, Line 16 – Page 45, Line 1)  He further noted that the December 2008 loan was intended to be prepared in the same manner as the December 2007 i.e. with the Alexanders' guaranteeing the loan, with the proceeds placed in the blocked account, and with the proceeds used to pay off the loan.  (*Wilcutt* Depo, Page 91, Line 21 – Page 92, Line 12)  Thus, despite Wilcutt's representations to McDaniel that the loan could and would be prepared according to the terms set by McDaniel, the facts indicate the Wilcutt never intended to issue the loans according to those terms.

Furthermore, the loan application states that it was a "Commercial Loan for Bond."  (*See Loan Application* attached hereto as Exhibit "G")  Wilcutt acknowledged that he knew that the loan was being given to satisfy certain bond requirements.  (*Wilcutt* Depo, Page 55, Line 12 – Line 21; Page 81, Line 11 – Line 19)  Wilcutt also acknowledged that the loan application indicated it was to be paid off in a month and that it indicated that it was approved on the basis of it being paid off in one month.  (*Wilcutt* Depo, Page 82, Line 2 – Line 3; Page 93, Line 24 – Page 94, Line 10; *see also Credit Summary Approval Sheet* attached hereto as Exhibit "I")  However, the note indicates that the maturity date of the loan January 26, 2010, which reflects the term requested by McDaniel.  (*See* Note for December 31, 2008 loan attached hereto as Exhibit "J")  The loan was in fact paid back on January 20, 2009 pursuant to the terms reflected on the application for the note.  (*Wilcutt* Depo, Page 95, Line 12 – Line 22)

8

For the year-end December 31, 2008, Cherry prepared financial statements which state a long-term note payable for Poynter Construction to Poynter in the amount of $1 million and with a term of 13 months. (*See December 31, 2008 Financial Statement* attached hereto as Exhibit "K") The financial statement states that Poynter Construction had cash or cash equivalents in excess of $1 million. This financial statement confirmed the arrangement McDaniel discussed with Wilcutt. (*See* Exhibit "K") McDaniel received the December 31, 2008 financial statement on April 22, 2009 along with the promissory note prepared by Wilcutt and PBI indicating that Poynter had personally been provided a loan in the amount of $1 million with a maturity date of January 26, 2010. (*McDaniel* Depo, Page 147, Line 7 – Page 149, Line 13.) The December 31, 2008 financial statement reflected that Poynter Construction sustained a loss of about $213,008.00 during 2008 but it also reflected that there was $1,049,872.00 in cash in Poynter Construction due to the $1 million "loan." (*See* Exhibit "K")

On April 20, 2009, McDaniel approved a bid bond for the Caverna Elementary Project. That bond was issued based in part on the December 31, 2007 financial statement, which indicated that Poynter had the capacity to place capital in the amount of $500,000.00 into Poynter Construction. That bond was also issued based on Wilcutt's representation to McDaniel that PBI could and would issue Poynter $1 million loan with a term of at least 13 months to satisfy the capital requirement for the year ending December 31, 2008. (*McDaniel*, Affidavit, ¶ 15) McDaniel issued the final bonds on the Caverna Elementary Project after receiving and in reliance on December 31, 2008 year-end financial statement and the promissory note in the amount of $1 million, which indicated that the term of the loan was 13 months and did not indicate that the loan was subject to it being placed in blocked account. (*McDaniel*, Affidavit, ¶ 16) If the December 31, 2008 financial statement had stated that the $1 million loan was not in

Poynter Construction, McDaniel would not have issued the final bonds on the Caverna Elementary Project.  (*McDaniel*, Affidavit, ¶ 17)

## II.   HARDISON'S KNOWLEDGE OF THE FRAUD

Hardison had known Poynter since 2000, and he described their relationship as "very personal."  (Hardison, *Depo* at Page 11, Line 8 – 11 attached hereto as Exhibit "L")  Specifically, he stated:

> he [Poynter] built a house down below me; and he built my house; and his mother lives across the street from me; and I had written Mr. Alexander's insurance for years, his commercial and personal, and had a relationship with them; and he visited with me often, ate dinner with us often.  We had drinks together, went fishing together, went on vacation together, gave derby parties with him. Had a very – never a bad moment.

(Hardison, *Depo* at Page 12, Line 18 – 22).  Hardison said Poynter referred to him as his second father.

Hardison testified that the statement in the December 4, 2007 letter to PBI that the $500,000.00 only has to show on the books as of December 31, 2007 did not reflect what he told Poynter.  (Hardison, *Depo* at Page 30, Line 12 – 17)  He claimed that he told Poynter that:

> He would have to inject the money into the company prior to Mr. Taylor or whoever was going to do his financial statement to the show the money was there and it was subrogated in order to get bonded, because . . . you have to leave the money there until the company agrees to release it.

(Hardison, *Depo* at Page 30, Line 17 – 22).  He further communicated that the bonding company would want to know that the money could not be used for anything other than construction.  (Hardison, *Depo* at Page 31, Line 25 – Page 32, Line 5)  Hardison claimed that he knew the $500,000.00 was put into Poynter Construction, but he had no knowledge of it actually coming out of the company.  (Hardison, *Depo* at Page 34, Line 10 – 19).  He never told Poynter that he

could immediately pay the money back to avoid interest and told him that the money needed to stay in Poynter Construction until Great American agreed to release it.  (Hardison, *Depo* at Page 35, Line 10 – 24).

When Poynter asked Hardison about increasing his bonding capacity to $10 million, Hardison claims that he informed him that he would need to place more money in the bank and keep it there and Poynter responded that the he would see what he could do.  (Hardison, *Depo* at Page 45, Line 23 – Page 46, Line 3)  Poynter was the one who brought up putting a million dollars in the bank and asked Hardison what that would do for him.  Hardison indicated that if he put $1 million in the bank that he would be able to bond the projects he was wanting to bond. (Hardison, *Depo* at Page 47, Line 3 – Line 16)  Poynter did not inform Hardision how he was going to bring that money in to the company, though he did talk about borrowing the money (Hardison, *Depo* at Page 47, Line 14 – 23).  Hardison knows Wilcutt, but Poynter never told Hardison that he was working with Wilcutt or what he was going to do to meet the capital requirement.  (Hardison, *Depo* at Page 48, Line 7 – 16).  Hardison claimed to be unaware that Poynter had borrowed money at the end of 2008.  (Hardison, *Depo* at Page 49, Line 2 – 6).  He claimed that he never had a conversation with Poynter about a million dollar loan to Poynter Construction.  (Hardison, *Depo* at Page 49, Line 10 – 13)

Conversely, Poynter has testified that Hardison was fully involved in the plan or scheme to defraud misstate the financial position of Poynter Construction.  Specifically, he stated that Hardison personally loaned him $100,000 in 2005 to help him improve his capital for bonding purposes.  (Poynter, *Depo* at Page 28, Line 6 – Page 30, Line 15 attached here as Exhibit "M") With regard to the December 31, 2007 loan, Poynter then explained Hardison's involvement as follows:

> Jerry called me one day; and I think I was headed to a project . . . and he called me and told me - - and we were trying to get some bonds at the time on different projects; and he explained to me while I was on the phone how I needed to borrow this money and what I needed to happen; and, basically, I had him call Dennis Wilcutt to make sure that it was handled the right way.  You know, I just - - I said, "Jerry, if you don't mind, would you call Dennis and tell him what we need" . . .  I asked him to call Dennis.

(Poynter, *Depo* at Page 31, Line 22 – Page 32, Line 25).  Additionally, Poynter testified that when he wrote to Wilcutt in December 2007 that his bonding agent stated that it only had to show in the books as of December 31, 2007 and that the money could be blocked as a security measure, that he was taking the exact information that Hardison had told him and relaying it to Wilcutt.  (Poynter, *Depo* at Page 42, Line 23 – Page 44, Line 6)  Regarding Hardison's knowledge of the structure of the December 31, 2007 loan, Poynter stated:

> Q.  So, from your conversations with Mr. Hardison, it was your understanding that he was aware that this loan would be taken out at the end of the year and would be paid back shortly after the first of the year?
> A.  Ye – yes, that, That I wouldn't – he said that I wouldn't – there was no sense in me having to pay interest on that money, you know, to borrow it for that long, so it was that's the reason it was a quick transaction.
> Q.  Okay.  The Last Sentence, "Also, notes now in Poynter Construction name need to be moved to Poynter Homes in order for there to be a zero balance owed by Poynter Construction at year end."  Again, I assume that that is is something that Mr. Hardison told you that you needed to do?
> A.  Yes.

(Poynter, *Depo* at Page 44, Line 9 – Line 22)  Poynter further stated that Hardison would inform him when it was necessary to inject money into Poynter construction.  (Poynter, *Depo* at Page 33, Line 21– Page 34, Line 4)  Poynter said that when money needed to be injected in the company that Hardison would call him and tell him that it needed to done just like the first, referring to the December 31, 2007, when Poynter asked Hardison to phone Wilcutt personally.

(Poynter, *Depo* at Page 35, Line 9 – Line 19) Poynter claimed that Hardison was aware of the structure of the December 31, 2008 loan.  (Poynter, *Depo* at Page 54, Line 21 – Page 56, Line 5)

## III.  APPROVAL OF THE LOANS WITHIN PBI

Wilcutt's direct supervisor, Avery Matney, who was the regional president, had authority to approve loans of $1 million dollars or more.  (*Wilcutt*, Depo, Page 16, Line 9 – Line 15).  If loans exceeded Matney's authority, multi-million dollar loans, then Wilcutt would take them to the loan committee for approval.  (*Wilcutt*, Depo, Page 18, Line 14 – Line 17)  Matney approved the December 31, 2007 loan. (*Wilcutt*, Depo, Page 33, Line 1 – Line 6)  Matney required that the Alexanders' act as guarantors and that the proceeds be placed in a blocked account so that no other party would be able to access the money in order for that loan to be issued.  (*Wilcutt*, Depo, Page 39, Line 19 – Page 40, Line 2; Page 44, Line 16 – Page 45, Line 1)  The December 31, 2008 loan, which was within Matney's authority, was also approved by Matney pursuant to the terms that it would be paid into a blocked account and the loan proceeds would be used to pay off the loan the following month.   (*Wilcutt*, Depo, Page 94, Line 1 – Line 23)  The loan documents indicate that the loan would also go to the loan committee for approval.  (Exhibit "G", "Credit Summary and Approval Sheet")  Specifically, the "Credit Summary and Approval Sheet" states:

> This is a loan for bonding purposes.
> The [deposit account] is blocked, the funds will be applied to this loan in January [2009], the loan will be ratified by the loan committee.  A.M. [Matney] approved the loan on these terms.

(*Wilcutt*, Depo, Page 94-5, *See* Exhibit "I")

## IV.  THE REPORT OF W. THOMAS FINN II

Great American retained Finn to give opinions regarding the structure of the loans and whether there was any valid business purpose for structuring the loans in the manner which they

were.  Based on his "professional education and training and years of experience dealing with banking matters, and research and review of matters relating to this case," Finn opined:

    A. PBI Bank, Inc. ("PBI") and its officer, Dennis K. Wilcutt, knowingly created false and misleading bank records to benefits their customer, Dewayne Poynter.
    B. PBI and its officer, Denis K. Wilcutt, knowingly participated in fraud and deception with their customer, Dewayne Poyner.
    C. Dennis K. Wilcutt breached his fiduciary duty to his employer, PBI, by falsifying and creating deceptive bank records.

(Finn, *Report* at pg. 1 attached hereto as Exhibit "N").  Finn based those opinions on the fact that the January 2, 2009 letter was false, that the structure of the loans resulted in no actual credit being extended, that loan documents for the December 31, 2008 loan contained several false statements, including as to the term and the fact that they were unsecured, and that the loans, as structured, served no valid business purpose.  (Finn, *Report* at pg. 1-4).

## ARGUMENT

      PBI effectively makes four arguments as to why Great American should not be able to recover from Wilcutt and PBI – 1) they claim that neither PBI nor Wilcutt made any false representations to Great American upon which relied when making bonding decisions, 2) that neither PBI nor Wilcutt had actually knowledge of the Poynter's fraud, 3) that Great American is imputed with knowledge of the various false statements regarding the loans because of Hardison's knowledge of their falsity, and 4) that Great American's own failures caused the losses.  On all of these points, PBI misconstrues the facts in its favor.  PBI ignores the fact that Wilcut prepared false bank documents and made false statements regarding the 12/31/07 and 12/31/08 loans upon which Great American relied in approving bonds for Poynter Construction.  Furthermore, there are sufficient facts from which a finder of fact can infer that PBI Bank and Wilcutt had actual knowledge of the fraud being perpetrated by Poynter as well as their

participation in the same.  Finally, although Great American should not be imputed with

knowledge on the part its agent, Hardison, who participated in the scheme to defraud it, Hardison

has in fact testified that he was not aware of the fraudulent conduct complained of such that even

if his knowledge were imputed to Great American there is a dispute in the facts as to whether he

was actually aware of the fraud.  Thus, PBI has failed to establish that it is entitled to judgment

as a matter of law.

## I. WILCUTT AND PBI MADE FALSE STATEMENTS AND PREPARED FALSE AND/OR MISLEADING BANK DOCUMENTS TO MISREPRESENT POYNTER CONSTRUCTION'S FINANCIAL CONDITION AND GREAT AMERICAN RELIED ON THOSE STATEMENTS AND DOCUMENTS WHEN ISSUEING BONDS.

Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky.

*See Lappas v. Barker*, 375 S.W.2d 248, 252 (Ky. 1963)(where the court found that a party was

liable for aiding and abetting fraud).  In order to prove that a party aided and abetted fraud, a

plaintiff must prove that a party committed fraud, that the party accused of aiding and abetting

that fraud gave "substantial assistance or encouragement" to the person who committed fraud

and that the person accused of aiding and abetting the fraud knew of the wrongful conduct.

*Miles Farm Supply, LLC v. Helena Chemical Company*, 595 F.3d 663, 666 (6th Cir. 2010).  In

order to establish fraud in Kentucky, a party must prove:

> (1) the defendant made a material representation to the plaintiff;
> (2) the representation was false; (3) the defendant knew the
> representation to be false or made it with reckless disregard for its
> truth or falsity; (4) the defendant intended to induce the plaintiff to
> act upon the misrepresentation; (5) the plaintiff reasonably relied
> upon the misrepresentation; and (6) the misrepresentation caused
> injury to the plaintiff.

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (citing *Flegles,*

*Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)).

Here, setting aside for now PBI's claim that Hardison's knowledge is imputed to Great American, PBI does not contend that there is no evidence that false statements and/or documents were presented to Great American in connection with the bonding program for Poynter Construction. Rather, PBI contends that Great American did not rely on the false statements when issuing the bonds that caused the losses complained of. Specifically, PBI claims that Great American did not rely on the December 31, 2007 financial statement, which indicated Poynter had paid-in-capital in the amount of $500,000.00 to Poynter Construction, when issuing the bonds because it received the received the June 30, 2008 interim statement which indicated that the "paid-in-capital" had been transferred to out of Poynter Construction.

First, it should be noted that this argument is baseless when discussed in reference to the loss that occurred on the Barren County Emergency Service Project, because the bonds issued for that project were issued in April 2008. At that time, Great American had received and was relying "heavily" upon the December 31, 2007 financial statement which falsely indicated that Poynter had "Additional Paid-in-Capital" in the amount of $469,196.00 to Poynter Construction. Furthermore, the June 30, 2008 financial statement, which PBI claims precludes Great American from further relying on the December 31, 2007 financial statement, had not yet been produced much less provided to Great American. Thus, with respect to Barren County Emergency Service Project, the premise of PBI's argument, that Great American had received the June 30, 2008 financial statement, fails and thus does the argument itself.

With respect to bonds issued after Great American received the June 30, 2008 financial statement, PBI argues that since Great American received the June 30, 2008 financial statement that indicated that the $469,196.00 of paid-in-capital was paid as a distribution of capital out of the company, that Great American no longer or could no longer justifiably rely on the December

31, 2007 financial statement.  However, that argument seems to be based on the premise that June 30, 2008 financial statement somehow corrected the false statement in December 31, 2007 financial statement regarding Poynter Construction's capital.  In fact, the June 30, 2008 financial statement simply further perpetuated the false statement in December 31, 2007 financial statement by stating that $500,000, that was never placed in the company was simply distributed out of the company and therefore still available to be placed back into Poynter Construction.

McDaniel continued to rely on the December 31, 2007 financial statement as the starting point for Poynter Construction's capitalization for 2008.  In fact, the combination of the December 31, 2007 and June 30, 2008 financial statements demonstrated that Poynter had paid in capital to Poynter Construction in the amount of $469,196.00, and that he had distributed that paid-in-capital out of the company sometime before June 30, 2008 to *himself*.  Based on those representations, McDaniel had no reason to think that Poynter could not simply transfer that money back into the company.  In fact, by referencing "the $500,000" in the emails referred to by PBI in its motion and in almost every other context, it is clear that McDaniel believed there was a specific pot of money that had been transferred out of Poynter Construction that simply had to be placed back into Poynter Construction from another of Poynter's accounts.  This is, in part, why McDaniel was willing to issue the bonds on the City of Oak Grove project contingent upon "the $500,000.00" being brought back into the company.  If the December 31, 2007 financial statement had not indicated the $469,196.00 was paid in as capital as opposed to a loan to Poynter Construction from PBI, McDaniel never would have issued the bonds on the City of Oak Grove project.  Thus, in issuing the bonds on the City of Oak Grove, McDaniel continued to reasonably rely on the false statement, contained in the December 31, 2007 financial statement made possible by the sham loan from PBI, and the January 2, 2008 letter from Wilcutt, that

17

Poynter had paid in capital in the amount $500,000.00 to Poynter Construction and that Poynter Construction had no debt to PBI.

Furthermore, prior to McDaniel beginning to issue bonds for Poynter Construction, he tried to obtain three years of financial statements from Poynter Construction but was unable to do so because Poynter had only recently entered the general construction business.  Given the amount of financial information requested, Poynter must have known that Great American would continue to rely on the December 31, 2007 financial statement to, as McDaniel put it, establish a trend of Poynter Construction's capabilities and bond worthiness.  That is in fact what McDaniel did when he issued the City of Oak Grove bonds on the condition that the money he thought was present at the end of 2007 be placed back in the company.

In fact, PBI's contention that Great American could no longer justifiably rely on the December 31, 2007 financial statement once the June 30, 2008 financial statement was available, seems disingenuous given that in the very same motion PBI criticizes McDaniel's underwriting practices in 2007, because he did not obtain three years of financial statements before issuing bonds.  Specifically, PBI stated that:

> According to McDaniel, the standard submission for a construction company to make to Great American for consideration would include:
>
> 1.   three years of financial statements on the construction company;
> 2.   tax returns;
> 3.   information on background and qualifications.
>
> McDaniel's underwriting file contained none of the above items. . . . His underwriting file contained only one financial statement -- a December 31, 2006 personal financial statement on Poynter. Based on Hardison's assurances and a personal financial statement, McDaniel began issuing bid bonds for PC.

(PBI, *Memorandum in Support of Summary*, at 4-5)  By so stating, PBI was clearly trying to imply that McDaniel had failed in some way to exercise due diligence when issuing bonds after 2007 without reviewing and relying on 2004, 2005, and 2006 financial statements.  Thus, its later contention that McDaniel could not rely on the combination of the December 31, 2007 and June 30, 2008 financial statements to infer that Poynter would be able to meet the condition of placing the $500,000.00 back into Poynter Construction is not only incorrect but is disingenuous.

PBI's argument regarding reliance on false statements similarly fails with respect to the bonds issued for the Caverna Elementary School Project.  First, in December 2008, McDaniel testified that he spoke to Wilcutt and explained to him the terms under which the $1 million loan needed to be made – that it needed to be made to Poynter personally, that it needed to be for at least 13 months, and that it could not have a corporate guarantee.  During that conversation, Wilcutt stated that he could and would be able to make the loan under those conditions.  However, the facts indicate that in reality he did not and never intended to make the loan under those terms despite his representation to McDaniel.

At that time that he represented that to McDaniel that he could make that loan, Wilcutt knew that the year before Poynter had only been able to obtain a loan for half that amount on the condition that the funds were placed in a blocked account, and that the loan would be paid within less than one full business day.  Furthermore, he knew at the time of his conversation with McDaniel that the Alexanders' would be guaranteeing the loan.  He testified with respect to the December 2007 loan, that his superior required the money to be placed in a blocked account to protect the Alexanders' such that he no doubt knew at the time he was talking to McDaniel in December 2008, that the $1 million loan would have to be placed into a blocked account as well.  This fact is confirmed by the loan write up prepared by Wilcutt attached hereto as Exhibit "I".

Furthermore, when he finally did prepare the December 31, 2008 loan, Wilcutt used the exact same procedure he had used when he made the December 31, 2007 loan except that he lengthened the term from less to one full business day to about 20 business days, which demonstrates that he intended to structure the loan in that manner the entire time despite his representations to McDaniel.  Given those facts, among others, a reasonable juror could infer that Wilcutt never had any intention to structure the loans in the manner that he informed McDaniel he could and would, and made a false statement about his ability and intention to make the loan under those terms.  Furthermore, McDaniel relied on that statement when he approved the bonds on the Caverna Elementary Project.  Thus, there is evidence that McDaniel relied on the false statement of Wilcutt that he could and would issue a loan based on the terms expressed by McDaniel when he in fact had no intention of doing so.

Furthermore, PBI's argument that there were no false representations made to Great American to induce it to issue the final bonds on the Caverna Elementary Project is completely inconsistent with the facts.  The undisputed facts are that McDaniel received the December 31, 2008 financial statement and the note for the December 31, 2008 loan on April 22, 2009 before he issued the final bonds on the Caverna Elementary Project.  The financial statements and the note both indicated that the loan had been prepared as he requested, and at that point he had no reason to doubt that the proceeds from the loan was in Poynter Construction's account as agreed upon, because the financial statement indicated the same.  Thus, McDaniel reasonably relied upon false statements in the note and false statements in the financial statements based on the note when he issued the final bonds on the Caverna Elementary Project upon which Great American ultimately suffered a loss.

II.   **WILCUTT AND PBI HAD KNOWLEDGE OF POYNTER'S FRAUDULENT CONDUCT AND SUBSTANTIALLY ASSISTED HIM WITH RESPECT TO THE SAME BY PROVIDING HIM LOANS THAT ALLOWED HIM TO MISREPRESENT HIS AND HIS COMPANIES FINANCIAL CONDITION.**

PBI claims that Great American cannot establish that it and Wilcutt knew that Poynter was engaging in wrongful conduct. PBI seems to premise this argument on that fact that there has yet to be a Perry Mason moment in this case in which Wilcutt, or some other employee of PBI, has broken down on cross examination and confessed that they indeed knew all along that the one day "loan" he prepared on December 31, 2007 and the 26 day "loan" on December 31, 2008, both of which he placed in a blocked account to which his customer had no access, were intended to allow Poynter to misrepresent his and Poynter Construction's financial condition. However, by in effect arguing that proof of knowledge requires an actual confession on the part of a party accused of fraud PBI has set the bar far beyond the standard of evidence actually required.

In Kentucky cases involving fraud, intent and actual knowledge on the part of the party accused of fraud may be inferred from the circumstances. *See Denzik v. Denzik*, 197 S.W.3d 108 (Ky. 2006)(where the court found evidence that a wife disavowed an affair during her divorce, that the actual father of her child had a small income at the time of the divorce, and that the wife had relations with the father more than her husband was sufficient for a jury to infer the intention to defraud and knowledge that statements regarding paternity were false); *see also White v. United* States, 20 F. Supp. 623 (W.D. Ky. 1937)("A charge of fraud cannot be sustained unless it is shown that the person charged had in his mind the intention to deceive another, but the intention may be inferred from the consequences of the act."). Furthermore, although the issue has not been addressed in Kentucky, courts in other jurisdictions that follow Restatement (Second) of Torts § 876 in defining the claim for aiding and abetting tortious conduct, like

21

Kentucky, have held that the knowledge of the other parties wrongful conduct may be inferred from the circumstances.  *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000)("For the purposes of establishing aiding and abetting liability, 'the requisite intent and knowledge may be shown by circumstantial evidence.'")(quoting *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)("Proof of a defendant's knowledge or intent will often be inferential[.]").  Thus, contrary to PBI's contention, an actual confession of knowledge on the part of PBI personnel is not required to establish their knowledge of fraud, as circumstantial evidence indicating knowledge is sufficient.

Here, there is substantial evidence of Wilcutt and PBI's knowledge of the fraud.  First, the loan documents indicate that the loans in question were being given for bonding purposes and Wilcutt admitted that he knew the loans were being used to obtain bonds.  Second, Wilcutt's testimony indicated that Poynter's grandparents, the Alexanders, were big customers of the bank that the bank wanted to please.  Third, although the note indicated a term of 13 months, Wilcutt and PBI were aware the loan was only being made for 25 days.  Fourth, Wilcutt was aware that Poynter needed the money to be in place at the year end and structured the loans such that it would be present at that time and then would be immediately removed.  Fifth, Wilcutt and PBI were aware and required that the loans would be placed into a blocked account to which Poynter would have no actual access.  Sixth, just after the December 31, 2007 loan was made, Wilcutt prepared a letter verifying that Poynter had injected $500,000.00 into Poynter Construction and that Poynter Construction owed no money to PBI all while failing to mention that the $500,000.00 injected into the company was actually a loan to Poynter Construction and that the reason Poynter Construction had no debt was that PBI and WIlcutt had used the very same

$500,000.00 to pay off the loan the first business day after the loan was made.    Seventh, Wilcutt spoke to McDaniel before the December 31, 2008 loan was issued and McDaniel informed him how the loan needed to be structured to satisfy the capital requirements.  Given those facts, a reasonable jury could infer that the Wilcutt and PBI knew that Poynter was engaging and wrongful and tortious conduct.

In fact, the Sixth Circuit has previously found that a bank and a bank officer had the requisite knowledge to establish that they aided and abetted fraud in a case with facts so similar to this case that it almost appears that the participants in this scheme may have used it as model, except that PBI's and Wilcutt's prolonged and, at times, direct involvement exceeded that of other bank and bank officer.  *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d at 535-7 (6th Cir. 2000).   In that case, Travelers, as surety, required Leahey Construction, Co., as principal, to meet certain capital requirements in order for Travelers to issue various bonds on its behalf.  *Id.* at 526.  Travelers indicated that the capital requirement could be meet by Mr. Leahey taking out a personal loan, Mr. Leahey then loaning the funds to Leahey Construction, and Mr. Leahey subordinating his right to receive repayment to Travelers such the money would not leave Leahey Construction without Travelers permission.  *Id.*  Instead, Leahey went to KeyBank, with whom he had a previous relationship, and took out a 30 day loan in the amount of $275,000.00 which was deposited on July 29, 1996 and repaid on August 2, 1996 pursuant to a side agreement with the bank that the loan would be repaid within 5 days of being paid out.  Mr. Leahey then obtained a July 31, 1996 bank statement showing the presence of the money and used that to obtain various bonds from Travelers.  *Id.* at 527, 529-30.  Travelers suffered a loss on the bonds and brought claims against the bank for aiding and abetting Leahey's fraud.

In response to the claim of aiding and abetting fraud, the bank argued, among other things, that Travelers could not establish that it or its officer knew of Leahy's tortious conduct. *Id*. at 535.  The court, applying the restatement that is applicable in Kentucky, first noted that the "requisite intent and knowledge may be shown by circumstances."  *Id*. (quoting *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir. 1985)).  The Court then stated:

> We agree with Travelers's contention that there was sufficient circumstantial evidence from which a jury could reasonably infer that Donnelly and KeyBank knew that Leahey was engaging in tortious conduct. First, Donnelly acknowledged during trial that he and Leahey had known each other since 1991, and that on several occasions he had assisted Leahey with loans for bonding purposes. Second, as early as February 22, 1996, Donnelly understood that Leahey's entrance into commercial construction would "require[] special bonding" and that, as a result, Leahey had been "putting funds into the business." Third, KeyBank's own documents reveal that, on or before July 8, 1996, it was informed by Leahey that the purpose of the $ 275,000 loan was "to obtain approval from a new Bonding Company." Fourth, the July 24, 1996 memorandum sets forth Donnelly's understanding that Leahey requested "these funds to be there at month-end." Fifth, the memorandum reveals that even though the loan was classified as a thirty-day agreement, Leahey intended to repay it just two days after the July 1996 month-end.

*Id.*  Based on those facts, the Court concluded that a reasonable jury could infer that the bank and its officer knew that Leahey was engaging in tortious conduct such that they could be held liable for aiding and abetting his fraud.  *Id.*

All of the facts which the Sixth Circuit found sufficient to establish knowledge in *Leahey Construction, Co.* are present here – Wilcutt and PBI had a close relationship with Poynter given that his grandparents were highly valued customers of the bank; Wilcutt and PBI were aware that

24

Poynter was using the loans to place funds into Poynter Construction for bonding purposes as the loan documents themselves indicate and as Wilcutt acknowledged; Wilcutt was aware that the funds needed to be in Poynter Construction's account by December 31 of each year; and the term of the December 31, 2008 loan indicated on the note and/or other loan documents differed from the actual term of 25 days.  Furthermore, in addition to facts similar those present in *Leahey Construction, Co.*, there are additional facts that indicate knowledge on the part of Wilcutt and PBI, including but not limited to that fact that they placed the money in a blocked account to which Poynter never had access; the fact that Wilcutt made false and misleading statements in the January 2, 2008 letter verifying the injection of funds that were not present; the fact that Wilcutt prepared a note with terms that differed from the application that just happened to correspond to the term set by McDaniel as to length; the fact that the December 31, 2007 loan indicated that it was provided on December 21, 2007 but was not actually paid out until 10:31 a.m. on December 31, 2007 and was then repaid to PBI the very next business day as soon as the bank opened; the fact that McDaniel spoke directly to Wilcutt regarding the structure of the loans and that Wilcutt falsely indicated to him that he could and would structure the loans in the manner requested; and the fact that Wilcutt and PBI's involvement in the fraud was ongoing for over a year.  Thus, the evidence in this case, which greatly exceeds that in *Leahey*, is sufficient for the jury to infer knowledge of the wrongful conduct.

In an argument related to its insistence that there is no evidence of knowledge on the part of PBI or Wilcutt, PBI argues that there is no evidence that it substantially assisted Poynter in his fraudulent conduct.  However, in making that argument, it effectively is simply making that same argument discussed above that Wilcutt and PBI's conduct was not knowing.  Specifically, PBI states that "a claim for aiding and abetting will only apply in circumstances in which the

substantial assistance to the primary violator was knowing, and a showing of passive behavior or inaction by a defendant is typically insufficient to support an aiding and abetting claim."  (PBI, *Memorandum in Support of Summary*, at 19).  PBI then goes on to state that that statement reflects the principle that aiding and abetting liability should not be imposed on a company acting in the ordinary course of business, and it states that banks extending loans will not typically be subjected to liability for doing so.  It then concludes that the only evidence shows PBI was simply extending loans to a borrower such that Great American cannot prove that it knowingly substantially assisted with the fraud.  *Id.* at 19-20.

In fact, the Sixth Circuit in *Leahey Constr. Co.*, 219 F.3d at 536, addressed this exact argument with respect to the bank and officer at issue in that case.  Specifically, the court stated:

> In further support of their position, Donnelly and KeyBank  argue that (1) the loan "was a lawful transaction," (2) "short-term loans are 'commonplace,'" and (3) "there is nothing unusual or improper about borrowing for bonding purposes." We do not take issue with any of these individual statements. When considered in context, however, otherwise legitimate conduct can give rise to a negative inference. *See Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985) (reversing the district court's grant of summary judgment in favor of a bank accused of assisting with a customer's fraud, concluding that "although the facts . . . are unremarkable taken in isolation, we find that taken together, they present what should have been a jury issue on the question of aiding-and-abetting liability").
>
> Moreover, although short-term lending may be "commonplace," the details of this particular loan (e.g., its four-day duration straddling the July 1996 month end) were highly unusual. See *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) ("A party who engages in atypical business transactions . . .,may be found liable as an aider and abettor with a minimal showing of knowledge."); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("If the method or transaction is atypical . . .,it may be possible to infer the knowledge necessary for aiding and abetting liability.").

*Id.*  Essentially, the court was stating that even an otherwise legal transaction made in the course of business may aid and abet fraud under certain circumstances and that if the transaction is abnormal or unusual in some way that the court is more likely to find that the facts indicate they aided and abetted fraud.

Here, as discussed above, the loans at issue were unusual in exactly the same manner as the loans were unusual in *Leahey Constr. Co.* in that they were made for an extremely short period of time straddling the year-end.  Furthermore, the "loans" here were even more unusual in that they effectively were not even loans because the proceeds were placed in a blocked account in PBI to which Poynter and Poynter Construction had never had access.  That structure was so unusual that Wilcutt testified that he had in fact never before structured loans in that manner during his entire banking career.  Thus, considering the extremely unusual nature of the loans and the facts discussed above, the jury could reasonably infer, even more so than the jury in *Leahey Constr. Co.*, that PBI and Wilcutt knowingly provided substantial assistance to Poynter's wrongful conduct.[1]

Although PBI never actually addresses the meaning of substantial assistance because it focuses on knowledge, it does make the statement that Great American cannot prove substantial assistance.  As used in the Restatement (Second) of Torts § 876, which Kentucky has adopted, "substantial assistance" means that an aider and abettor's conduct was a substantial factor in causing the tort.  When assessing substantial assistance in *Leahey Constr. Co.*, 219 F.3d at 537, the Six Circuit stated:

> With respect to this determination, the Third Circuit has explained as follows:
>
> > The comments to section 876 of the Restatement provide a list of five factors: "the nature of the act

---

[1] *See also* Finn, *Report* (indicating unusual nature of transaction)

encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Additionally, the court in Halberstam provided a sixth factor, the duration of the assistance provided. Finally, the alleged substantial assistance must be the proximate cause of plaintiffs' harm.

*Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.,* 113 F.3d 1484, 1495 (8th Cir. 1997) (citations omitted).

In light of these factors, there can be little doubt that KeyBank's $275,000 loan substantially assisted Leahey in his efforts to temporarily inflate the assets of LGC&M and induce Travelers to bond LGC&M's construction projects. As discussed in Part II.A.4.a. of this opinion, Leahey's fraud consisted of the wrongful manipulation of LGC&M's financial position. By securing the $275,000 loan, Leahey was able to "verify" to Travelers that he had complied with its first funding request, thereby establishing a vital and initial level of credibility. Because this credibility served as the foundation for increased trust between the parties, we conclude that the extension of the loan was of substantial assistance to Leahey.

Likewise, Poynter's fraud consisted of the wrongful manipulation of Poynter Construction's financial condition. Poynter, like Leahey, would have been unable to engage in that manipulation if PBI had not provided the December 31, 2007 and the December 31, 2008 "loans." Furthermore, beyond simply providing the loans, Wilcutt and PBI participated more directly in the fraud than the bank and officer in *Leahey Construction, Co.* by making three false statements that further assisted the fraud beyond simply making the atypical loans – Wilcutt prepared the January 2, 2007 letter which ""verif[ied]" that Poynter had injected $500,000.00 in capital into Poynter Construction and that it had no debt to PBI; Wilcutt spoke to McDaniel and stated that he could and would issue the $1 million loan in the manner he requested despite there being evidence that he had no intention of ever doing so; and Wilcutt and PBI prepared the false note for the December 31, 2008 loan, which was provided to McDaniel, as being for a term of 13

months despite the fact that the loan was only for a term of a month.  As in *Leahey Construction, Co.*, those actions allowed Poynter to "verify" to Great American that Poynter had complied with its funding requests which in turn established the credibility that induced Great American to issue bonds.  *Cf. id.*

### III.    PBI AND WILCUTT ENGAGED IN A CIVIL CONSPIRACY TO COMMIT FRAUD WITH POYNTER BY AGREEING TO MISREPRESENT POYNTER'S FINANCIAL CONDITION.

After arguing that Great American cannot establish claims for aiding and abetting fraud, PBI briefly argued that Great American cannot establish a claim civil conspiracy for effectively the same reason.  Specifically, PBI argues that civil conspiracy requires an agreement and that Great American cannot prove that Wilcutt or PBI agreed to engage in the fraudulent plan or scheme.  However, as with knowledge, an agreement may be inferred from the circumstances.  *See Leahey Constr. Co.*, 219 F.3d at 538 (citing *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982))("Like the knowledge requirement for the tort of aiding and abetting, the existence of an express agreement between defendants will frequently be provable only through circumstantial evidence.").  Furthermore, as noted in Section II, there are substantial facts here from which a jury could infer an agreement between PBI, Wilcutt, and Poynter to commit fraud.

Specifically, Wilcutt and PBI put the money in a blocked account such that there was never actually any credit extended.  Wilcutt agreed to prepare the January 2, 2007 letter on Poynter's behalf "verify[ing]" that he had "injected" $500,000.00 into Poynter Construction and that Poynter Construction had no debt to PBI.  In December 2008, Wilcutt spoke to McDaniel and indicated to him that he would and could prepare the loans as McDaniel requested despite the evidence indicating that he had no attention of every doing so.  Then, when the note was actually issued, Wilcutt prepared it to indicate that it was unsecured and that it had the exact 13

month term requested by McDaniel despite the fact that the note was at best secured but its own proceeds and was actually only for a 1 month term.  Far from indicating only that Wilcutt and PBI knew of the fraud, those facts, which establish that Wilcutt and PBI actually made false statements in furtherance of the fraud, are sufficient to establish that PBI and Wilcutt agreed to engage in civil conspiracy.

**IV.   GREAT AMERICAN CAN NOT BE IMPUTED WITH HARDISON'S KNOWLEDGE OF THE CONSPIRACY BECAUSE HE PARTICIPATED IN THE SCHEME AND, IN THE EVENT HIS KNOWLEDGE COULD BE IMPUTED TO GREAT AMERICAN, THERE IS EVIDENCE THAT HE DID NOT KNOW OF THE SCHEME SUCH THAT THERE IS A DISPUTE AS TO MATERIAL ISSUE OF FACT.**

PBI also argues that Great American is unable to rely on the various false statements and misrepresentations discussed above because Hardison allegedly had knowledge of the true nature of Poynter's finances.  PBI asserts that Great American is imputed with knowledge of the Hardison to the extent that he was acting within the scope of the agency agreement.  PBI further indicates that Great American should be imputed with Hardison's knowledge even to the extent that that he exceeded his authority as to innocent third parties.  Although Great American contends that to the extent Hardison engaged in the fraudulent scheme described in the Complaint and the Amended Complaint that he was clearly not acting within his authority as an agent Great American and that PBI is clearly not an innocent third party, there is little need to address those issues here, because to the extent Hardison engaged in the fraudulent scheme to misrepresent Poynter Construction's financial condition to Great American his interests would be adverse to Great American such that Great American would not be imputed with his knowledge.

The general rule of agency law states that a principal is charged with notice of facts that the agent knows or has reason to know.  *See Illinois Cent R. v. Fontaine,* 289 S.W. 263, 267 (Ky.

1926); see also Restatement (Third) of Agency § 5.03 ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal ... .").  The general rule of imputed knowledge is based on the presumption that "the agent will do his duty toward his principal and impart to the latter any knowledge which the agent obtains affecting his principal's business . . . ."  *Illinois Cent R. v. Fontaine,* 289 S.W. at 267.  However, "when there is no foundation for such a presumption the reason for the rule ceases and it will not be applied."  *Id.*  Thus, Kentucky's highest Court has held:

> the presumption upon which the general rule is founded is destroyed and has no basis when the transaction relates to personal matters of the agent or servant and where his interests are adverse to those of his principal, and that the presumption is likewise destroyed when from the facts there arises a counter one that the agent would not communicate the fact to his principal when such communication "would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating.

*Id.*  The Restatement (Third) of Agency § 5.04, on which Kentucky courts often rely, condenses the rule as being that "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."

Here, as PBI points out in its brief, there is substantial evidence of not only Hardison's knowledge but also his involvement in the fraudulent scheme to misrepresent Poynter's financial condition and thereby induce Great American into offering the bonds.   In fact, Poynter's testimony indicated not only that Hardison participated in fraud by relaying information he knew to false to Great American but that he conceived of the idea.   Poynter testified that Hardison himself instructed him on how to structure the loans such that Poynter Construction would appear to meet Great American's capital requirements.  Furthermore, there is a letter from the time period during which the transactions were occurring that is consistent with Poynter's

testimony and thereby indicates that he did not formulate that story recently in order to cover-up for his own bad behavior.  Additionally, Hardison acknowledged that he had a long standing personal relationship with Poynter and his family which indicates why he would be willing to act on Poynter's behalf by participating in the fraudulent scheme as opposed to Great American's behalf.  Thus, there is evidence from which a reasonable jury could infer that Hardison was acting on his and/or Poynter's behalf participating in and apparently outright organizing Poynter's plan and scheme to misrepresent the financial condition of Poynter Construction such that his knowledge of the plan and scheme would not be imputed to Great American.

PBI fails to address the exception discussed above, generally referred to as the adverse interest exception, in its memorandum and instead relies solely on *Germania Insurance Co. v. Wingfield*, 22 Ky. L. R. 455 (Ky. 1900), which was designated not to be reported by the court.  In that case, the Court of Appeals found that knowledge on the part of an insurance agent when he sold a policy to an insured that the insured was not then operating the insured distillery prevented the insurance company from denying cover under a policy provision that suspended coverage if the distillery ceased to operate for more than ten days.  *Id.* at 457-8.  However, that case never discussed whether the agent had been involved in an attempt to defraud the insurance company and thus never addressed whether the adverse interest exception would prevent the knowledge from being imputed to the insurance company.  Essentially, the Court expressed the general rule described above without every getting to the exception to the general rule.  In fact, that is not surprising both because there did not appear to be an allegation that the agent attempted to defraud his own company and because the adverse interest exception was not officially adopted until 17 years later by *Illinois Cent R.*, 289 S.W. at 267-8.  Subsequent courts, while not specifically addressing the adverse interest exception, have noted an insurance company is not

imputed with knowledge and therefore may deny cover where an insured knows that that information his soliciting agent is providing to the insurance company is false. *See Ketron v. Lincoln Income Life Ins. Co.,* 523 S.W.2d 228 (Ky. App. 1975)("[N]o longer would the full responsibility be placed on the applicant to see that the application is correctly filled out, except where the applicant inserts the answer. We qualified the statement by saying that if the applicant knows that false answers are being placed in the application he will be responsible for them."); *Rudolph v. Shelter Ins. Cos.*, 2008 Ky. App. LEXIS 276 (Ky. App. 2008)(indicating that if the insured supplied and was aware of the false answers on the application that the insurance company could deny coverage).  Thus, *Wingfield* does not apply current agency law and is factually distinguishable from the current case.

In fact, going back to *Leahey Constr. Co.*, 219 F.3d 519 (6th Cir. 2000), which discussed Ohio's version of the adverse interest exception under facts similar to those here, it is clear that if the requirements of the adverse interest exception are met, as they are here, that Great American would not be imputed with the knowledge of Hardison.  In that case as here, there was evidence that the bonding agent, who was actually employed by an independent insurance company like Hardison, was made aware of the sham loan and had knowingly passed on financial statements that contained false information about the company.  *Id.* at 540.  Like PBI, the bank in Leahey argued that the agent's knowledge of the fraudulent scheme should have been imputed to Travelers, as surety, and therefore should have prevented any reliance by Traveler's on any of the statements made as a result of that scheme.  *Id.*  Travelers in turn argued that the agent was an active participant in the scheme to defraud and that "knowledge gained by an agent in the course and furtherance of a scheme to defraud is not imputed to the principal."  *Id.* at 541.  After noting the applicability of the adverse interest exception, the court found that jury should be able

to decide both whether the agent was acting within the scope of his agency such that the general imputation principle is applicable, and then whether the agent's participation in the fraud should prevent said imputation.  *Id.*[2]; *see also State Farm Fire & Casualty Co. v. Sevier*, 537 P.2d 88 (Ore. 1975)(where the court held that knowledge on the part of insurance agent is imputed to the company as against a third party injured by an insured despite evidence that the agent participated in a fraud but that the insurer would still be able to bring a claim against the insured, and presumably other involved parties, for fraud).

However, at this point it is actually unnecessary to address the standard for imputation of knowledge between Hardison and Great American, because there are facts from which a reasonable juror could find that Hardison in fact had no knowledge of the fraudulent conduct and misrepresentations made by Poynter.  Specifically, as noted above, Hardison claims that he had no knowledge of the alleged short term nature of the loans or how Poynter was going about meeting the capital requirements.  He further testified that he told Poynter that the money used to capitalize the company would need to stay in the company until Great American allowed it to be taken out and that he in fact never learned that the $500,000.00 had been taken out of the company.  If his sworn testimony is to be believed by the jury, then there would be no knowledge to impute to Great American even if the law actually held that said knowledge should be imputed to Great American. Thus, even if PBI were correct that Hardison's knowledge of the fraud should be imputed to Great American and therefore prevent Great American from relying on the various false statements above, Hardison's testimony is in direct dispute of the testimony cited by PBI as to his knowledge and would therefore prevent any grant of summary judgment based on Hardison's knowledge.

---

[2] In fact, with respect to that finding, the Court was actually granting the bank a new trial so that those issues could be addressed by the jury because the district court had improperly instructed the jury on agency law.

**V.     GREAT    AMERICAN'S    CLAIMS    FOR    NEGLIGENT    AND/OR INTENTIONAL MISREPRESENTATION AGAINST PBI AND WILCUTT ARE SUPPORTED TO EVIDENCE DEVELOPED TO DATE.**

PBI claims that Great American cannot establish a claim for negligent and/or intentional misrepresentation against PBI or Wilcutt for the related reasons that neither PBI nor Wilcutt made any representations upon which Great American could rely, and because Great American in fact did not rely on any representations of PBI or Wilcutt.  Obviously, Great American does not dispute that a false statement must be made and that it must have relied on the false statement in order to assert a claim for negligent and intentional misrepresentation.  The problem with this argument is simply that it is factually in accurate.

As discussed in more detail above, with respect to the December 31, 2007 loan, Wilcutt and PBI made at least two factually inaccurate statements.  First, Wilcut, with the approval or his superiors, prepared a note that indicated that $500,000.00 had been loaned despite the fact that Poynter Construction never had access to the money as the bank placed it in a blocked account. Second, Wilcutt prepared the letter on January 2, 2008 "verify[ing]" that Poynter had "injected" $500,000 into Poynter Construction and that Poynter Construction had no debt the day the 1 day $500,000 "loan" was paid back.  Both the note and the statement were factually false – the note because it stated that the money was a loan to Poynter when in actuality it was not, and the letter because no money was actually "injected" into Poynter Construction,  The proceeds were placed in a blocked account to which Poynter Construction had no access, and because when the letter, which was clearly designed to give the impression to the reader that Poynter Construction had been capitalized in the amount of $500,000, was written when Poynter Construction either had no money in its blocked account or had a debt to PBI.  Furthermore, there is evidence, discussed in more detail above, that Wilcutt and PBI knew that Great American would receive the false

information they generated regarding Poynter Construction's financial condition, because the note documents indicate it was for bonding purposes.  Poynter wrote a letter to PBI and Wilcutt explaining that the why he needed the money and how he needed the transaction structured, and Poynter testified that Wilcutt spoke to Hardison before the first loan was issued.  (*See* attached Exhibit "O")  *See Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (citing Restatement (Second) of Torts § 552) (stating that either the original recipient or a person that the party knew would receive the false statement may bring a claim for negligent misrepresentation)   Thus, there is sufficient evidence to establish both that false statements regarding Poynter's financial condition were made and that PBI and Wilcutt knew that the false statements would make their way to Great American and induce it to act.

With respect to the December 31, 2008 loan, PBI and Wilcutt similarly made false and misleading statements and/or documents.   Specifically, Wilcutt phoned McDaniel prior to making the December 31, 2008 loan and indicated that he could and would make the loan based on the terms expressed by McDaniel when in fact the evidence indicates that he had no intention of ever structuring the loan in that manner.   Additionally, Wilcutt and PBI prepared a false and misleading note that stated that the term of the note was 13 months when the term of the note was actually approximately one month and that indicate that the proceeds were being placed in a blocked account.   Additionally, again, there is evidence Wilcutt and PBI knew that Great American would receive and rely on those false statements in that Wilcutt actually spoke to McDaniel and knew why he needed the note and the terms he expected.   The note documents state that the note was being given for bonding purposes, and PBI and Wilcutt knew that the loan needed to be in Poynter's account at year end.   Thus, again, there is sufficient evidence to establish both that false statements regarding Poynter's financial condition were made and that

PBI and Wilcutt knew that the false statements would make their way to Great American and induce it to act.

Additionally, as noted above, there is also evidence that Great American relied on the false statements and documents generated by Wilcutt and PBI in issuing the bonds that resulted in losses to Great American.  PBI's argument about reliance is not based on whether the false statements were sufficient enough for Great American to rely but rather whether Great American had received the false statements or whether the false statements had been corrected before Great American issued the bonds in questions.  Furthermore, it should be noted that although PBI does make blanket statements that there was no reliance to support a claim of fraud that it actually seems to concede that there was reliance with respect to the bonds issued for the Barren-Metcalfee County EMS project because McDaniel received the December 31, 2007 financial statement, which was based on Wilcutt's January 2, 2008 letter, before issuing the bonds on that project.  Thus, PBI's primary contention regarding the failure of reliance to establish intentional or negligent misrepresentation was that there was no reliance for the City of Oak Grove project or Caverna Elementary project, which is the same argument PBI made regarding reliance with respect to the aiding and abetting claim discussed above.

With respect the City of Oak Grove bonds, PBI argues once again that Great American could not have relied on the false information conveyed about Poynter Construction's financial position because the June 30, 2008 financial statement indicated that the $500,000.00 had been paid out of the company.  However, as noted above, the combination of the December 31, 2007 financial statement, which was based on the January 2, 2008 letter from Wilcutt, and the June 30, 2008 financial statement indicates that Poynter injected $500,000.00 into Poynter Construction and that he simply paid that money out of the company prior to June 30, 2008.  Given the false

impression created by the combination of those financial statements, McDaniel was willing to issue the City of Oak Grove bonds on the condition that the $500,000.00 be brought back into the Poynter Construction, because he thought it was just a matter of moving money that had been taken out of the company back into the company.  Furthermore, as McDaniel indicated at his deposition, the reason he would request multiple years of financial records was so that he could establish a trend for the company to more accurately assess their financial condition.  He continued to use the December 31, 2007 financial statement for that purpose, because contrary to the inference PBI draws from the June 30, 2008 financial statement, he was never informed that the December 31, 2007 statement was false only the capital that was moved (in fact the capital never was really there but he did not know that at the time).  Thus, for those reasons and for the reasons discussed more thoroughly above, Great American justifiably relied on the December 31, 2007 financial statements when it issued the City of Oak Grove bonds.

With respect to the bonds on the Caverna Elementary project, PBI argues that Great American could not have relied on its false information with respect to the $1 million loan because it issued those bonds before it received the false information regarding the $1 million loan.  However, once again as noted above, Wilcutt spoke to McDaniel in December 2008, over 4 months before the bid bonds on the Cavera Elementary project were issued, and Wilcutt indicated that he could and would prepare the loan in the manner requested by Great American despite not actually having the intention to do so.  Furthermore, the final bonds, on which the loss actually occurred, were issued by Great American after McDaniel received the December 31, 2008 financial statement, which was based on the false bank documents, and the note prepared by PBI, which falsely represented the terms of the loan.  Thus, Great American

justifiably relied on false information provided by Wilcutt and PBI when it issued the bonds on the Caverna Elementary project.

## VI.    GREAT    AMERICAN    STATISFIED    ITS    UNDERWRITING RESPONSIBILITIES

PBI also makes a brief argument that PBI does not have a duty to underwrite on behalf of Great American. This argument is actually a mix of two arguments – first it goes back to the reliance argument discussed twice above i.e. that PBI never made a false statement to Great American and then it raises a proximate cause type argument i.e. that the loss was actually caused by Great American's failure to exercise ordinary care in confirming that various funds were present.  However, that argument ignores the facts discussed above in Section II on reliance that establish that Great American in fact did check on the status of the capital and was mislead by the false statements of PBI and Wilcutt to conclude that it was safe to issue the various bonds. Thus, the evidence establishes that it was in fact PBI and Wilcutt's false statements as opposed to underwriting failure on Great American's part that proximately caused Great American's loss.

In fact, this issue was also addressed by the Sixth Circuit in *Leahey Construction, Inc.,* 219 F.3d at 544.  In that case, the bank argued that Travelers' losses were not caused by the $275,000.00 loan at issue but were in fact caused by Travelers underwriting failures.  In that case, the court noted that in Ohio proximate cause requires that the action satisfy the "but for" analysis as well as the foreseeability analysis.  *Id*.  That proximate cause standard is effectively identical to the standard applicable in Kentucky.  *See Spivey v. Sheeler*, 514 S.W.2d 667, 672 (Ky. 1974).  Then, in explaining that the evidence was sufficient to establish proximate cause, the Sixth Circuit stated:

> The evidence at trial established that but for the $ 275,000 loan, Travelers would not have done business with Leahey. There was also sufficient evidence to support the jury's finding that,

> notwithstanding Travelers's alleged errors, the $ 275,000 loan produced, in a natural and continuous sequence, and all within a relatively short period of time, the resulting harm to Travelers.

*Leahey Construction, Inc.,* 219 F.3d at 544.

Here, as in *Leahey*, the evidence is likewise sufficient to establish proximate cause despite the existence of any alleged underwriting failures on the part of Great American.  The evidence establishes that if PBI had not extended fictitious and/or sham loans and/or made the false statements in connection therewith, that Poynter Construction's financial position as stated in its December 31, 2007 and December 31, 2008 financial statements would not have been inflated and materially misstated, and Great American would not have issued the bonds for Poynter Construction.   Furthermore, given that PBI knew the loans were being given to capitalize Poynter Construction for bonding purposes, it was foreseeable to PBI and Wilcutt at the time they engaged in their wrongful conduct that it could have created a loss to Great American.   Thus, as in *Leahey*, there is sufficient evidence to establish that PBI and Wilcutt's conduct was proximate cause of Great American's loss despite any alleged underwriting mishaps.

## CONCLUSION

PBI has failed to establish it is entitled to a judgment as a matter of law.  The evidence establishes that the PBI and Wilcutt made false statements regarding the fictitious and/or sham loans it issued for PBI, that PBI and Wilcutt facilitated the false statements of other parties, that PBI and Wilcutt knew that the false statements would be used in Poynter's fraud, that Great American relied on the false statements, and that its reliance on those statements resulted in a loss.  Thus, Great American respectfully requests that PBI's motion for summary judgment be denied.

Respectfully Submitted,

*/s/ Benjamin A. Bellamy*
TIMOTHY D. MARTIN
BENJAMIN A. BELLAMY
WARD, HOCKER & THORNTON, PLLC
Hurstbourne Place, Suite 700
9300 Shelbyville Road
Louisville, Kentucky 40222
(502) 583-7012
(502) 583-7018 (Fax)
TMartin@whtlaw.com
*Counsel for Plaintiff*
*Great American Insurance Company*

## <u>CERTIFICATE</u>

I hereby certify that on the 15th day of October, 2012, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF System, and the foregoing document was served electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures upon all parties in the electronic filing system in the case by electronic mail including:

Scott A. Bachert
W. Greg Harvey
Harned, Bachert & McGehee, PSC
324 East Tenth Avenue
P.O. Box 1270
Bowling Green, Kentucky 42102-1270
(270) 782-3938
(270) 781-4737 (Fax)
bachert@hbd-law.com
harvey@hbmfirm.com
*Counsel for Defendants*
*PBI Bank, Inc.*
*Dennis K. Wilcutt*

Bobby H. Richardson
Richardson, Gardner, Barrickman & Alexander
117 East Washington Street
Glasgow, Kentucky 42141
(270) 651-8884
(270) 651-3662 (Fax)
mms@rgba-law.com
*Counsel for Defendants*
*Taylor, Polson & Company, PSC*
*John M. Taylor, III, CPA*

Mark H. Flener
1143 Fairway Street, Suite 101
P. O. Box 8
Bowling Green, Kentucky 42102
(270) 783-8400
(270) 783-8872 (Fax)
mflener@bellsouth.net
*Counsel for Defendants*
*James Alexander*
*Dorothy Alexander*

Jeffrey A. Taylor
Landrum & Shouse, LLP
106 West Vine Street, Suite 800
P.O. Box 951
Lexington, Kentucky 40588-0951
(859) 255-2424, Ext. 248
(859) 233-0308 (Fax)
jtaylor@landrumshouse.com
*Counsel for Third-Party Defendants*
*Glasgow Insurance Agency, Inc.*
*Jerry Hardison*

   I further certify that a copy of the foregoing document and Notice of Electronic Filing, properly addressed and postage pre-paid, was deposited in the United States Mail to:

Anthony Dewayne Poynter
561 Brentwood
Glasgow, Kentucky 42141
*Defendant*

         /s/ Benjamin A. Bellamy
         *Counsel for Plaintiff*
         *Great American Insurance Company*

42