### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:10-CV-00161-JHM

GREAT AMERICAN INSURANCE COMPANY                    PLAINTIFF

V.

ANTHONY DEWAYNE POYNTER, et al.                     DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on PBI Bank's Motion for Summary Judgment [DN 89]. Also before the Court is PBI Bank's Motion to Strike, Exclude or Limit the Opinion of Great American's Expert [DN 87]. Fully briefed, this matter is ripe for decision. For the following reasons, PBI Bank's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Moreover, PBI Bank's motion to strike, exclude, or limit is **GRANTED** in part and **DENIED** in part.

### I. BACKGROUND[1]

This case involves various claims of fraud and misrepresentation asserted by Great American, an insurance company that writes surety bonds for commercial construction contractors, against PBI Bank and others. According to Great American, PBI Bank provided sham loans to Anthony Poynter to allow him to state that his company, Poynter Construction, had met certain capital requirements and induce Great American to issue bid, performance, and payment bonds on behalf of the company. As discussed in more detail below, Great American asserts that it relied on Poynter Construction's capital position, which was misrepresented with PBI Bank's assistance, and that this reliance induced it to issue various surety bonds. Great American further asserts that its issuance of these bonds led to significant losses when Poynter Construction later became insolvent.

---

[1]These facts are taken in the light most favorable to the non-movant, Great American.

### 1.      Great American's Bonding of Poynter Construction

Anthony Poynter owned and operated Poynter Homes, Inc., a small-time spec home building company. In the early 2000s, he decided to transition his business into commercial construction. To assist with this transition, Poynter enlisted the help of Jerry Hardison, his long-time friend. Hardison was the principal of Glasgow Insurance Agency. Soon thereafter, in 2005, Hardison began shopping Poynter Construction to various surety companies. This was done in an attempt to determine whether Poynter Construction would be bondable in the surety market.

In 2007, Hardison submitted Poynter to Mark McDaniel, a bond-writer for Great American. When a party requests bonding from Great American, McDaniel generally requests three years of financial records. However, McDaniel testified that in the case of Poynter Construction, he instead heavily relied on the company's December 31, 2007 financial statement since Poynter Construction was a new company transitioning into the commercial construction business. (Mark McDaniel Dep. [DN 94-1] 16.) Poynter Construction's December 31, 2007 financial statement shows that there was $503,565.00 in the company's bank account at the year's end. Importantly, this amount includes the proceeds of a loan from PBI Bank in the amount of $500,000.00.

### 2.      PBI Bank's December 2007 Loan

On December 4, 2007, Poynter delivered a letter to PBI Bank's loan officer, Dennis Wilcutt, requesting a $500,000.00 loan. This request stated as follows:

> This letter is a personal written request from Dewayne Poynter in the amount of $500,000.00. I need to personally inject this amount into Poynter Constructions account which will allow me bonding capacity of 5 million for 2008. Accounts maybe locked while this money is injected into the account as a security measure. My Bonding Agent says this transaction only has to show on the books as of December 31, 2007. Also, notes now in Poynter Constructions name need to be moved to Poynter Homes in order for there to be a zero balanced owed by Poynter Construction at year end.

(Letter from Dewayne Poynter [DN 90-5].) Consistent with this request, PBI Bank loaned Poynter $500,000.00 on December 31, 2007. The note evidencing this loan was set to mature on January 2, 2008. PBI Bank deposited the loan proceeds in a secure account where they could not be unilaterally withdrawn by Poynter or Poynter Construction. Those same proceeds were then used to pay off the note on January 2, 2008. Wilcutt testified that he was aware that the loan was being used to inject capital into Poynter Construction so that it could obtain bonds. (Dennis Wilcutt Dep. [DN 94-5] 86.) On Poynter Construction's year-end ledger, the loan was listed as a note payable to PBI Bank.

The accountant who prepared Poynter Construction's December 31, 2007 financial statement was concerned about the $500,000.00 loan that appeared on the company's ledger. When she asked Poynter about the transaction, however, she was told that the $500,000.00 was capital. Poynter then presented the accountant with a letter written by Wilcutt. The letter, dated January 2, 2008, stated:

> This letter is to verify and confirm that DeWayne Poynter, injected $500,000.00 into Poynter Construction Account and that Poynter Construction has no debt at PBI Bank-Glasgow.

(Letter from Dennis Wilcutt [DN 94-4].) In her deposition, the accountant stated that based on these representations, she re-classified the note payable as additional paid-in-capital. McDaniel then relied on the accountant's December 31, 2007 financial statement in issuing bonds. For example, in April of 2008, Great American issued bonds for the Barren/Metcalfe County EMS project.

Thereafter, McDaniel received Poynter Construction's interim financial statement dated June 30, 2008. This statement indicated that there had been a capital distribution and that the $500,000.00 "injection" was no longer in the company. However, instead of refusing to issue additional bonds, McDaniel continued to issue them with the expectancy that the $500,000.00 would be placed back into the company. McDaniel stated that he believed it would not be an issue for Poynter to replace

the $500,000.00, as he believed that Poynter personally had the $500,000.00 on December 31, 2007

and that this money was subsequently distributed to him from Poynter Construction's account prior

to June 30, 2008. (Aff. of Mark McDaniel [DN 94-8] ¶ 10.)

On November 10, 2008, McDaniel approved the issuance of a bid bond for the City of Oak

Grove Project. He approved the final bonds on that project about December 1, 2008. McDaniel

stated that when he approved those bonds, it was represented to him that Poynter agreed to capitalize

Poynter Construction in the amount of $500,000.00 before the year-end of 2008.  (Id. ¶ 9.)

### 3.      PBI Bank's December 2008 Loan

On December 2, 2008, McDaniel met with Poynter, Hardison, and Poynter Construction's

new accountant. At that meeting, McDaniel informed the parties that Poynter Construction would

need to be capitalized with $1 million due to its requested bonding requirements for 2009. McDaniel

agreed that it was acceptable to capitalize using a loan instead of paid-in capital. But McDaniel told

the parties that he would require the loan to be payable by Poynter personally, for a period of

thirteen months. He also told the parties that he would require Poynter's interests in being repaid by

Poynter Construction to be subordinated to Great American's right to receive payment. After this

meeting, Wilcutt called McDaniel to discuss the terms to be included in the note. McDaniel stated

that Wilcutt represented that the loan could, and would, be issued under those terms. (Id. ¶ 15.)

Despite this representation to McDaniel, Wilcutt prepared a loan application which showed

the term as being until January 26, 2009, less than one month after the loan was to be issued.

Further, he stated that the loan was intended to be prepared in the same manner as the December

2007 loan, with the proceeds placed in a blocked account until they were used to pay off the loan.

(Dennis Wilcutt Dep. [DN 94-5] 91–92.) In his deposition, Wilcutt acknowledged that the loan was

4

approved on the basis of it being paid off in one month. (Id. at 82, 93–94.) Nevertheless, the promissory note indicates that the loan's maturity date is January 26, 2010, which reflects the term requested by McDaniel. The loan was, in fact, paid back on January 20, 2009.

At the year's end, Poynter Construction's accountant prepared a financial statement for the company, showing a long-term $1 million note payable with a term of thirteen months. The financial statement indicates that Poynter Construction had cash or cash equivalents exceeding $1 million and was thus consistent with the arrangement that McDaniel discussed with Wilcutt. On April 20, 2009, McDaniel approved a bid bond for the Caverna Elementary Project. Two days later, he received the December 31, 2008 financial statement. Soon thereafter, on July 30, 2009, McDaniel issued the final bonds on the Caverna Elementary Project.

### 4.    Current Lawsuit

Poynter Construction subsequently defaulted on several construction projects, forcing Great American to make payments. The payments included: $7,001.00 on the Barren/Metcalfe County EMS Project Bond; $644,017.01 on the City of Oak Grove Project Bond; and $145,906.50 on the Caverna Elementary Project Bond. Great American now seeks recovery for these losses. PBI Bank has filed a motion for summary judgment, as well as a motion to strike, exclude, or limit the opinion of Great American's expert, W. Timothy Finn, II. These motions are discussed below.

## II. PBI BANK'S MOTION FOR SUMMARY JUDGMENT [DN 89]

### A. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for

its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## B. DISCUSSION

In its summary judgment motion, PBI Bank effectively makes four arguments: 1) neither PBI Bank nor Wilcutt had actual knowledge of Poynter's fraud; 2) neither PBI Bank nor Wilcutt made any misrepresentations to Great American upon which it relied; 3) Great American is imputed with knowledge regarding the loans' true nature because Hardison had such knowledge and was its agent; and 4) Great American's own failures caused the losses. The Court considers each argument in turn.

### 1.   Actual Knowledge

In Count II of its complaint, Great American alleges that PBI Bank and its employee, Wilcutt, entered into a plan or scheme with Poynter and his accountants to commit fraud. This Count

6

appears to be based on a theory of aiding and abetting tortious conduct or, conversely, on a civil conspiracy theory. Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky. See Lappas v. Barker, 375 S.W.2d 248, 252 (Ky. 1963). To prove that a party aided and abetted fraud, a plaintiff must show that the defendant gave "substantial assistance or encouragement" to the person who committed fraud and that the defendant knew of the wrongful conduct. See Miles Farm Supply, LLC v. Helena Chem. Co., 595 F.3d 663, 666 (6th Cir. 2010). Under Kentucky law, constructive knowledge is not sufficient to support a claim of aiding and abetting; instead, a plaintiff must show that a defendant had actual knowledge that a tortfeasor was engaged in wrongful conduct. Id. at 666.

In the present case, PBI Bank argues that neither it nor Wilcutt actually knew about Poynter's fraud. According to PBI Bank, Wilcutt was simply presented with a loan request from Poynter, one of PBI Bank's customers, that the bank agreed to fulfill, and even if Great American could somehow demonstrate that Wilcutt should have known that Poynter was engaged in wrongful conduct, such constructive knowledge is not sufficient for a claim of aiding and abetting fraud. However, as Great American correctly asserts, in Kentucky cases involving fraud, actual knowledge may be inferred from the circumstances. See, e.g., Denzik v. Denzik, 197 S.W.3d 108, 111 (Ky. 2006) (noting that the evidence was sufficient for a jury to infer knowledge that statements as to paternity were false). Here, the Court finds that Great American has offered sufficient evidence of Wilcutt and PBI Bank's actual knowledge of the fraud to survive this summary judgment stage.

Several factors convince the Court that there is sufficient evidence of actual knowledge. First, the loan documents for both loans indicate that they were given for bonding purposes and Wilcutt acknowledged that he knew the loans were being used to obtain bonds. Second, Wilcutt was

7

aware that Poynter needed the loans to be in place at the years' ends, and he structured the loans so that the proceeds would be present at those times and then be immediately removed. Third, PBI Bank placed the loans in blocked accounts to which Poynter had no access. Fourth, after the 2007 loan was made and the proceeds were used to pay it off, Wilcutt prepared a letter verifying that Poynter had injected $500,000.00 into Poynter Construction and that it owed no money to PBI Bank, but failed to disclose that the $500,000.00 was a loan or that Poynter had requested all notes in Poynter Construction's name to be moved to Poynter Homes to show no debt owed by Poynter Construction at the year's end. Fifth, Wilcutt spoke to McDaniel before the 2008 loan was disbursed and indicated that he would structure the loan consistent with McDaniel's requirements. Sixth, while Wilcutt made such an indication and included a repayment term of thirteen months on the face of the note, Wilcutt testified that the loan was approved on the basis that it be paid off within one month. Given those facts, a reasonable juror could infer that Wilcutt and PBI Bank actually knew that Poynter was engaged in wrongful conduct.

The Court's conclusion is supported by Sixth Circuit precedent. In Aetna Casualty & Surety Co. v. Leahey Construction Co., the Sixth Circuit applied Ohio law and found that a bank and bank officer had the requisite knowledge to establish that they aided and abetted fraud in a case with facts remarkably similar to this one. 219 F.3d 519, 535 (6th Cir. 2000). Indeed, the Court found "sufficient circumstantial evidence" from which a jury could reasonably infer that a bank and bank officer knew that their customer was engaged in fraud when the bank was informed that the loan's purpose was to obtain approval from a new bonding company, the customer requested the funds to be there at the month's end, and the loan was repaid just two days after the month's end despite being classified as a thirty-day agreement. Id. at 525. Similar facts are present here. Moreover, there

8

are additional facts indicating that PBI Bank and Wilcutt had the requisite actual knowledge, as the loan proceeds were placed into blocked accounts, Wilcutt wrote a verification letter regarding the injection of capital into Poynter Construction's account, and Wilcutt spoke with McDaniel about his requirements for structuring the 2008 loan but nevertheless failed to comply with them.[2]

The Court's conclusion is also supported by the fact that Kentucky follows the Restatement (Second) of Torts § 876 in considering claims of aiding and abetting tortious conduct. See Miles Farm Supply, LLC, 595 F.3d at 666. While Kentucky courts have not specifically addressed the issue of actual knowledge, courts in other jurisdictions following § 876 have held that such knowledge may be inferred. See Aetna Cas. & Sur. Co., 219 F.3d at 535 (holding that under Ohio law, "requisite intent and knowledge may be shown by circumstantial evidence"); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) (holding that under New York law, "[p]roof of a defendant's knowledge or intent will often be inferential"). Thus, the Court is satisfied that Great American's circumstantial evidence is sufficient evidence of actual knowledge to survive PBI Bank's motion.

In a related argument regarding Great American's aiding and abetting tortious conduct claim, PBI Bank asserts that there is no evidence that it substantially assisted Poynter in his fraudulent conduct. According to PBI Bank, a showing of passive behavior is typically insufficient to support an aiding and abetting claim, and the requirement for active assistance reflects the principle that

---

[2]The Court recognizes that in its Reply, PBI Bank notes that Aetna Casualty & Surety Co. has been implicitly overruled by William D. Mundinger Trust U/A 10/13/00 v. Zellers, 473 B.R. 222 (N.D. Ohio 2012). However, this implicit overruling occurred because Ohio law is unsettled as to whether a cause of action exists for aiding and abetting tortious conduct. 473 B.R. at 232. Under Kentucky law, courts recognize claims for aiding and abetting tortious conduct. See Miles Farm Supply, LLC, 595 F.3d at 666 (citing Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 485 (Ky. 1991)).

courts should not impose aiding and abetting liability on companies acting in the ordinary course of business. The Court finds, however, that this argument is without merit.

As PBI Bank correctly asserts, a bank that extends a loan to a borrower will generally not sustain aiding and abetting liability for that borrower's torts. See Glidden Co. v. Janderoa, 5 F. Supp. 2d 541, 557 (W.D. Mich. 1998) (holding that a bank cannot be liable for aiding and abetting fraud "merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others"). However, as the Sixth Circuit has recognized, "otherwise legitimate conduct can give rise to a negative inference" when considered in context. Aetna Cas. & Sur. Co., 219 F.3d at 536. In this case, the details of the particular loans were highly unusual. The loans were made for short periods of time straddling the years' ends and the proceeds, which were used to repay the loans, were placed in blocked accounts. In fact, Wilcutt testified that he did not recall having ever before structured loans in that manner. (Dennis Wilcutt Dep. [DN 94-5] 61.) Also, there is evidence that PBI Bank affirmatively made misrepresentations to Great American by verifying that Poynter had injected $500,000.00 into Poynter Construction and by structuring the 2008 loan in a manner that was inconsistent with the understanding reached between Wilcutt and McDaniel despite indications that the loan would be structured consistently with that understanding. The Court finds that in this context, a reasonable juror could conclude that PBI Bank and Wilcutt substantially assisted Poynter in his fraudulent conduct.

This conclusion is supported by the Restatement (Second) of Torts § 876, which provides that "substantial assistance" means that a defendant's conduct was a substantial factor in causing the tort. Aetna Cas. & Sur. Co., 219 F.3d at 537. The comments to § 876 list factors to consider when determining whether substantial assistance has been provided: "the nature of the act encouraged, the

amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Id. (citation omitted). In this case, the Court finds that Great American has presented sufficient evidence so that a reasonable juror considering these factors could conclude that there was substantial assistance. Summary judgment is thus inappropriate.

PBI Bank also argues that Great American cannot establish civil conspiracy. Specifically, PBI Bank argues that it merely made loans to Poynter and there is no evidence that PBI Bank knew that Poynter was engaged in wrongful conduct. However, the Court finds that Great American can make a civil conspiracy claim under the facts of this case. Under Kentucky law, civil conspiracy has been defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC, 277 S.W.3d 255, 260–61 (Ky. App. 2008) (citation omitted). "Civil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V., 2010 WL 2696278, at *13 (Ky. Ct. App. July 9, 2010).

Here, Great American has produced enough evidence from which a juror could infer an agreement between PBI Bank, Wilcutt, and Poynter to commit fraud. Specifically, a juror could draw such an inference from the fact that Wilcutt wrote a letter verifying that Poynter had injected $500,000.00 into Poynter Construction and that it had no debt to PBI Bank. A juror could also draw such an inference from the fact that Wilcutt prepared the 2008 loan documents to indicate that the loan was unsecured and that it had the thirteen-month term requested by McDaniel despite the fact that it was secured by its own proceeds and was actually for only a one-month term. Therefore, Great American has presented sufficient facts to support its civil conspiracy claim.

## 2.    False Representations

In Count III of its complaint, Great American alleges that PBI Bank and Wilcutt negligently or intentionally made misrepresentations on which Great American relied when issuing bonds. In its summary judgment motion, PBI Bank argues that neither it nor Wilcutt made misrepresentations to Great American. It also argues that Great American has not adequately alleged justifiable reliance. For the following reasons, the Court will grant PBI Bank's summary judgment motion in part.

Under Kentucky law, a plaintiff asserting negligent misrepresentation must prove that: 1) the transaction at issue is one in which the defendant had a pecuniary interest; 2) the defendant supplied false information; 3) the information was supplied for others' guidance in their business transactions; 4) the defendant failed to exercise reasonable care in communicating the information; 5) the plaintiff acted in reliance thereon; and 6) the false information caused injury. Presnell Constr. Managers, Inc. v. EH Constr., LLC, 134 S.W.3d 575, 580–82 (Ky. 2004) (citation omitted). A plaintiff asserting intentional misrepresentation must prove that: 1) the defendant made a material misrepresentation; 2) the misrepresentation was false; 3) the defendant knew the misrepresentation to be false or made it with reckless disregard for its truth or falsity; 4) the defendant intended to induce the plaintiff to act on the misrepresentation; 5) the plaintiff reasonably relied on the misrepresentation; and 6) the misrepresentation caused injury. Giddings & Lewis, Inc. v. Indusr. Risk Insurers, 348 S.W.3d 729, 747 (Ky. 2011) (citation omitted). Importantly, "a misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." Filbeck v. Coomer, 182 S.W.2d 641, 643 (Ky. 1944).

In this case, PBI Bank begins by arguing that Great American has not produced any evidence suggesting that it or Wilcutt made a false statement about a present or pre-existing fact. In so doing,

it asserts that the only communication between PBI Bank and Great American was the telephone call between McDaniel and Wilcutt about the 2008 loan that was to be made in the future. According to PBI Bank, because the call was about a future loan, as opposed to a present or pre-existing one, Great American cannot rely on it as the basis of any fraud or misrepresentation claim.

Great American counters that reasonable jurors could infer from the facts that Wilcutt made a false statement about a present or pre-existing fact, as they could conclude at the time of the call, he never intended to structure the 2008 loan in the manner that he informed McDaniel and that he made false statements about his ability and intent to make the loan under those terms. According to Great American, at the time of the call, Wilcutt knew that Poynter obtained a loan the prior year for only half the current amount requested and that those funds were placed in a blocked account, so if Wilcutt represented that he could make the loan consistent with McDaniel's requirements with no intention to do so, the misrepresentation would have concerned a present or pre-existing fact.

The Court agrees with PBI Bank. In this case, the only direct communication between PBI Bank and Great American involved the terms of the 2008 loan and how Wilcutt would structure it. Since that communication specifically relates to the future, Great American cannot rely on it as the basis of any fraud or misrepresentation claim. PBI Bank's summary judgment motion is **GRANTED** in part. This holding recognizes the fact that a breach of a promise to perform in the future is typically only relevant to a contract claim. See Cent. On Line Data Sys., Inc. v. Filenet Corp., 99 F.3d 1138 (Table), 1996 WL 483031, at *5 (6th Cir. Aug. 23, 1996) (noting that "[w]hile future promises can form the basis of an action for breach of contract, they cannot give rise to a claim for fraud" (internal quotations and citation omitted)).

However, the Court finds that Great American has produced sufficient evidence from which

reasonable jurors could infer that PBI Bank made other misrepresentations concerning present or pre-existing facts. For instance, as to the 2007 loan, Wilcutt prepared a note indicating that $500,000.00 had been loaned, despite the fact that Poynter never had access to the proceeds. Also, Wilcutt wrote a letter verifying that Poynter had injected $500,000.00 into Poynter Construction and that it had no debt with PBI Bank. Both the note and the statement could be deemed false or misleading: the note because it stated that there was a loan when the proceeds could not be accessed and the letter because no unsecured proceeds were actually injected into Poynter Construction. Moreover, the 2008 loan could be deemed false or misleading, as the note stated that there was a loan when in fact the proceeds could not be accessed. The note also indicated that it had a thirteen-month term despite Wilcutt's belief that the proceeds would be used to repay the loan within approximately one month. Thus, contrary to PBI Bank's assertion, Great American has produced evidence of various misrepresentations.[3]

Next, PBI Bank argues that Great American has not adequately alleged justifiable reliance. Specifically, PBI Bank argues that when issuing bonds, Great American could not have relied on the December 31, 2007 financial statement, which indicated that Poynter Construction had $500,000.00 of paid-in capital, because McDaniel had received the June 30, 2008 interim statement showing that the capital had been transferred out of Poynter Construction. Again, the Court disagrees. PBI Bank's reliance argument will be analyzed with respect to each of the bonds issued by Great American.

---

[3]The Court notes that under Kentucky law, actions for negligent misrepresentation must generally be brought by the original recipient of the information. However, such actions can also be brought by those who the defendant knew would get the information from the original recipient. See Presnell Constr. Managers, Inc., 134 S.W.3d at 580 (adopting § 552 of the Restatement (Second) of Torts, which describes the limited group of persons who can recover their losses).

*Barren/Metcalfe County EMS Project.* The Court finds that PBI Bank's reliance argument fails with respect to the Barren/Metcalfe County EMS Project. Great American issued the bonds for that project in April 2008. McDaniel stated that at that time, he was heavily relying on the December 31, 2007 financial statement, which indicated that Poynter Construction had $500,000.00 of paid-in capital. (Mark McDaniel Dep. [DN 94-1] 17–18.) Further, the June 30, 2008 financial statement which PBI Bank claims precludes Great American from further relying on the December 31, 2007 financial statement had not yet been produced or provided to Great American. Thus, with respect to the Barren/Metcalfe County EMS Project, Great American produced sufficient evidence of reliance.

*City of Oak Grove Project.* As an initial matter concerning the City of Oak Grove Project, the Court wishes to briefly address PBI Bank's argument that liability cannot exist because neither it nor Wilcutt had yet made a representation to Great American regarding Poynter Construction, as the telephone call between Wilcutt and McDaniel had not yet occurred. The Court disagrees. In this case, Great American has produced evidence that the December 31, 2007 financial statement was only made possible by PBI Bank's short-term loan in conjunction with the letter from Wilcutt stating that Poynter had injected $500,000.00 of capital to Poynter Construction and that it had no debt at PBI Bank. Taken in the light most favorable to Great American, this was a misrepresentation by PBI Bank, as the letter failed to indicate the true nature of the injection.

With respect to reliance, PBI Bank argues that liability cannot exist because Great American could no longer justifiably rely on the December 31, 2007 financial statement after it received the interim June 30, 2008 financial statement, which showed that $500,000.00 was paid as a distribution out of Poynter Construction. In other words, according to PBI Bank, McDaniel's receipt of the June

15

30, 2008 statement created a situation where he could not rely on the December 31, 2007 statement. But as Great American correctly points out, a reasonable juror could find that the interim statement merely perpetuated the false statements in the December 31, 2007 statement by indicating that the $500,000.00 was simply distributed out of the company–and thus available to be placed back into Poynter Construction. Indeed, a reasonable juror could believe that the combination of the financial statements demonstrated that Poynter had distributed the paid-in capital out of the company before June 30, 2008 *to himself* and that in issuing the bonds on the City of Oak Grove, McDaniel continued to reasonably rely on false statements in the December 31, 2007 statement, which was made possible by PBI Bank's short-term loan, in conjunction with the letter from Wilcutt. Accordingly, with respect to the City of Oak Grove Project, Great American has produced sufficient evidence of reliance.

*Caverna Elementary Project.* PBI Bank next makes a similar argument with respect to the bonds issued for the Caverna Elementary Project. Specifically, PBI Bank argues that Great American did not rely on any misrepresentation in issuing this bond because McDaniel approved the bid bond on April 20, 2009, after receiving the interim June 30, 2008 statement and two days before receiving a copy of the December 31, 2008 note representing the $1,000,000.00 loan. Again, though, PBI Bank fails recognize that a reasonable juror could find that when approving the bid bond for the Caverna Elementary Project, McDaniel continued to rely on the combination of the December 31, 2007 and the June 30, 2008 financial statements. Moreover, the facts show that McDaniel issued the project's final bonds on July 30, 2009, which was after he received the December 31, 2008 financial statement and the note for the 2008 loan. Because the December 31, 2008 financial statement and the note both indicate that the loan was prepared as McDaniel

16

requested, a reasonable juror could find that he reasonably relied on them when issuing the final bonds. In sum, Great American has produced sufficient evidence of reliance. Thus, PBI Bank's summary judgment motion is **DENIED** in part.

### 3. Hardison's Knowledge and Involvement

PBI Bank next argues that Great American cannot rely on the above misrepresentations since Hardison knew the true nature of Poynter Construction's finances and this knowledge is imputed to Great American. In other words, PBI Bank suggests that because Hardison was Great American's agent, his knowledge of Poynter Construction's true financial situation bars Great American from now asserting that it relied on PBI Bank's alleged misrepresentations. Great American, by contrast, argues that the Court cannot impute Hardison's knowledge to it since he participated in the scheme to defraud. Great American alternatively argues that summary judgment would still be inappropriate even if Hardison's knowledge could be imputed to it, as there is evidence that Hardison did not know of the scheme to defraud and a genuine dispute of material fact thus exists. For the following reasons, the Court agrees with Great American.

Under Kentucky agency law, the general rule is that a principal is charged with notice of facts that an agent knows or has reason to know. Ill. Cent R. Co. v. Fontaine, 289 S.W. 263, 267 (Ky. 1926). This rule is based on the presumption that the "agent will do his duty toward his principal and impart to the latter any knowledge which the agent obtains affecting his principal's business . . . ." Id. at 267. But "when there is no foundation for such a presumption, the reason for the rule ceases and it will not be applied." Id. The Restatement (Third) of Agency § 5.04 condenses this rule, explaining that "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act

17

solely for the agent's own purposes or those of another person."

In the present case, there is evidence that Hardison was involved in the alleged scheme to misrepresent Poynter's financial condition. Poynter testified that he relied on Hardison's advice as to Poynter Construction's capitalization and how to qualify for bonds. (Anthony Dewayne Poynter Dep. [DN 94-13] 25.) This testimony is consistent with the December 4, 2007 letter that Poynter gave to Wilcutt outlining instructions he received from his "Bonding Agent." Moreover, Hardison acknowledged that he had a long-standing personal relationship with Poynter and his family, (Jerry Hardison Dep. [DN 94-12] 11–12), which indicates why Hardison might be willing to act on Poynter's behalf by participating in the fraud. Thus, the Court finds that there is evidence from which a reasonable juror could infer that Hardison was acting adversely to Great American such that his knowledge should not be imputed to it. This conclusion is supported by the decisions of other courts. See, e.g., Aetna Cas. & Sur. Co., 219 F.3d at 541 (noting that "knowledge gained by an agent in the course and furtherance of a scheme to defraud is not imputed to the principal").

Moreover, the Court finds that even if PBI Bank is correct that Hardison's knowledge should be imputed to Great American, summary judgment would still be inappropriate since there are also facts from which a reasonable juror could find that Hardison had no knowledge of the alleged fraud. For example, Hardison testified in his deposition that he had no knowledge of the loans' short-term nature or how Poynter was going to meet the capital requirements. (Jerry Hardison Dep. [DN 94-12] 34–35.) Hardison also stated that he told Poynter that the money used to capitalize the company had to stay in the company until Great American allowed him to take it out. (Id. at 30.) If the jurors believe this testimony, Hardison would have no knowledge of Poynter's wrongdoing. Accordingly, there would be no knowledge to impute to Great American. A genuine dispute of material fact exists.

18

### 4.      Great American's Contribution to the Losses

Finally, PBI Bank argues that it has no duty to underwrite on behalf of Great American. In so doing, PBI Bank suggests that it was Great American's decision as to whether to serve as surety for Poynter Construction and that Great American was not required to continue serving as surety if it felt insecure about Poynter Construction's financial condition. But as Great American correctly counters, this argument ignores the evidence indicating that Great American acted as surety, at least in part, due to PBI Bank's misrepresentations as to the status of Poynter Construction's capital.

In Aetna Casualty & Surety Co., the Sixth Circuit addressed a similar argument that a surety company's losses were not caused by the bank's loan but were instead caused by the company's own underwriting failures. 219 F.3d at 544. In so doing, the Court stated that the evidence was sufficient to establish proximate cause since "notwithstanding [the surety's] alleged errors, the $275,000 loan produced, in a natural and continuous sequence, and all within a relatively short period of time, the resulting harm to [the surety]." Id. In the instant case, the evidence is likewise sufficient to establish a causal connection despite the existence of any alleged underwriting failures by Great American. To be sure, PBI Bank can highlight any alleged underwriting failures at trial. However, the Court finds that these failures simply cannot support the entry of summary judgment as a matter of law.

### III. PBI BANK'S MOTION TO STRIKE, EXCLUDE OR LIMIT THE OPINION OF W. TIMOTHY FLYNN, II, GREAT AMERICAN'S EXPERT [DN 87]

#### A. STANDARD

PBI Bank has moved to exclude Great American's expert under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Federal Rule of Evidence 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in

the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). In determining whether testimony is reliable, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion. These factors include: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review or publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Id. at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702.  Kumho Tire Co., 526 U.S. at 147.

Whether the Court applies these factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co., 526 U.S. at 150 (quotation omitted). Any weakness in the underlying factual basis bears on the weight, as opposed to admissibility, of the evidence. In re Scrap Metal Antitrust Litig., 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted).

## B. DISCUSSION

On June 29, 2012, Great American filed its Expert Witness Disclosure. (Disclosure [DN 62].) This disclosure included a preliminary report of W. Timothy Finn, II. Within the report, Finn offers

three opinions: 1) PBI Bank and Wilcutt knowingly created false and misleading bank records to benefit Poynter, their customer; 2) PBI Bank and Wilcutt knowingly participated in fraud and deception with Poynter; and 3) Wilcutt breached his fiduciary duty to PBI Bank by falsifying and creating deceptive bank records. PBI Bank has moved to strike, exclude, or limit these opinions.

In support of its motion to strike, exclude, or limit, PBI Bank asserts that Finn's opinions are improper legal conclusions that contain conclusory statements. PBI Bank further asserts that Finn's opinions with regard to whether PBI Bank acted knowingly attempt to impermissibly infringe upon the role of the jury. Great American counters that Finn's testimony is relevant, as it serves to explain why the banking transactions were misleading. Great American also counters that Finn's testimony is reliable because he has over forty years of experience in the banking industry, as well as expertise regarding the structure of loans. The Court considers these arguments in turn.

1.      **Opinions Regarding Whether PBI Bank and Wilcutt "Knowingly" Created False and Misleading Bank Records and "Knowingly" Participated in Fraud**

PBI Bank first argues that Finn's opinions regarding whether it and Wilcutt knowingly acted will not assist the trier of fact. In support, PBI Bank relies on *In re* Ocean Bank, wherein the court excluded an expert's opinion that a bank did not willfully violate the Fair Credit Reporting Practices Act because such testimony consisted of impermissible legal conclusions. 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007). According to PBI Bank, Finn's expert report must similarly be excluded since it contains opinions of PBI Bank's knowledge and is thus comprised of improper legal conclusions.

Great American counters that while the statements on their own may appear to be conclusory and legal in nature, their context shows that they instead relate to Finn's beliefs about what the facts indicate. In support, Great American notes that in his report, Finn examines the loans and explains why it would be misleading to represent them as actual extensions of credit. He also explains why

21

there was no valid business purpose for the loans and concludes that PBI Bank and Wilcutt must have known of their misleading nature. According to Great American, because Finn never undertakes to examine the legal standard regarding the mental state under which the jury should decide the case, his statements do not contain impermissible legal conclusions. See United States v. Dotson, 817 F.2d 1127, 1131–32 (5th Cir. 1987), *vacated in part on other grounds*, 821 F.2d 1034 (5th Cir. 1987) (admitting expert testimony that a defendant "willfully and intentionally" increased his income while knowing that he had not reported the taxes due because, when considered in context, the testimony was focused on what the facts indicated and not whether the defendant possessed the mental state).

The Court agrees with PBI Bank that Finn should not be allowed to testify on whether it and Wilcutt "knowingly" created false and misleading bank records or "knowingly" participated in fraud. Such testimony, like the testimony in *In re* Ocean Bank, consists of impermissible legal conclusions. Indeed, the Court in United States v. Dotson, which is relied on by Great American, even recognized that testimony regarding whether the defendant "willfully and intentionally" increased his income could be interpreted in an objectionable manner. 817 F.2d at 1132. It is the Court's belief that jurors are capable of comprehending the facts of this case and drawing correct conclusions regarding PBI Bank's knowledge from them. As the Supreme Court has noted,

> [E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'

Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962) (citation omitted). Thus, Finn's opinions regarding the knowledge of PBI Bank and Wilcutt are stricken and PBI Bank's motion is **GRANTED** in part.

Importantly, however, the bulk of Finn's testimony remains. In his report, Finn examines the loans and explains why it would be misleading to represent them as actual extensions of credit. He also explains why there was no valid business purpose for the loans, concluding that PBI Bank and Wilcutt created misleading records and participated in fraud. These opinions will undeniably assist the trier of fact to understand the evidence or to determine facts in issue. Accordingly, they are not objectionable. The Court's conclusion is supported by Federal Rule of Evidence 704, which provides that an opinion "is not objectionable just because it embraces an ultimate issue."

### 2.   Opinion Regarding Wilcutt's Breach of Fiduciary Duty

In a related matter, PBI Bank objects to Finn's opinion that Wilcutt breached his fiduciary duty on the basis that it constitutes a legal conclusion. However, as Great American correctly points out, experts often testify as to professional standards of care and whether they have been breached. See, e.g., _In re_ Air Crash at Lexington, 2008 WL 2954973, at *4 (E.D. Ky. July 30, 2008) (holding that experts could testify as to a pilot's standard of care since the jury did not have specialized knowledge of aviation procedures and standards). In this case, Great American argues that Wilcutt breached his fiduciary duty. To determine whether this is the case, the jury should be permitted to hear about the pertinent banking rules, as well as the applicable banking standards. Therefore, Finn's testimony on these matters will not be excluded. PBI Bank's motion is **DENIED** in part.

### 3.   Other Arguments Regarding Finn's Reliability

PBI Bank next argues that Finn's opinions are not reliable because he has no expertise in the bond industry. In support of this argument, PBI Bank notes that Finn's last employment experience at a bank was more than thirty years ago and his more recent experiences do not focus on bonding issues. The Court finds, however, that PBI Bank has mischaracterized Finn's report. A close reading

of the report shows that rather than testifying about bonding issues, Finn is concerned with banking industry standards–and his testimony is based on the structure of the loans and PBI Bank's following of various banking practices. Finn's report, therefore, will not be excluded on this basis.

Moreover, the Court finds that Finn has the necessary expertise to provide reliable opinions on banking industry standards and practices. The Sixth Circuit has noted that opinions derived from experience, such as those of Finn, are not easily subjected to traditional evaluations of reliability. See First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 335 (6th Cir. 2001) (allowing the testimony of an expert that was "derived largely from [his] own practical experiences throughout forty years in the banking industry" and noting that opinions formed in such a manner "do not easily lend themselves to scholarly review or to traditional scientific evaluation"). Thus, the Court agrees with Great American that the Daubert factors are not a useful tool for evaluating the reliability of Finn's opinions. Also, the Court finds that Finn has extensive experience to qualify as an expert in this case.

According to Finn's curriculum vitae, he has several years of professional and representative experience. From 1971 until 1977, he was the Vice President of Peoples Bank in Bagdad, Kentucky, and from 1971 until 1979, he served as a Senior Executive Officer of Deposit Bank in Pleasureville, Kentucky. From 1979 until 1988, Finn worked for Professional Bank Services as the Executive Vice President and Director of Consulting Services. Thereafter, from 1986 until 2002, Finn was employed by Furash & Company as a Consulting Associate. From 1988 until the present, he has been the Principal at Financial Management Consulting Group. (See Curriculum Vitae [DN 62-1] 1.) During this time, Finn has consulted on twenty bank start-ups, assisted in turning around a mutual holding company with lending issues, and consulted with a struggling community bank that was ultimately

24

made profitable. These professional and representative experiences qualify him as an expert.

Additionally, Finn has been invited on numerous occasions to speak on banking industry functions and has had articles published in myriad publications. (Id. at 6, 7.) Finn has also prepared reports for the Kentucky Banker's Association. Through these experiences, it is clear that Finn has become sufficiently familiar with the applicable banking standards, as well as with whether a bank's actions comply with those standards. Notably, Finn's report indicates reliance on the FDIC's Risk Management Manual of Examination Policies. This reliance, in conjunction with Finn's experience, sufficiently indicates that his testimony is based on the "same level of intellectual rigor that characterizes the practice in the relevant field." Bush v. Dyno Nobel, Inc., 40 F. App'x 947, 960 (6th Cir. 2002) (quoting Kumho Tire Co., 526 U.S. at 152)). Because Finn's report is based on more than unsubstantiated beliefs, Finn should not be precluded from giving his opinions.

PBI next attempts to attack Finn's opinions by citing a Stipulation and Consent Order entered into between the Financial Management Consulting Group, LLC and the Office of Comptroller and Currency. This consent order was based on an allegation that there were deficiencies in a loan review conducted by company personnel. However, Finn has stated that the loan review at issue was actually conducted by his associates. (See Aff. of W. Timothy Finn, II [DN 93-7] ¶ 5.) Further, even if the order has in some way damaged Finn's credibility, PBI Bank has provided no legal basis as to why a previous error on a loan review should preclude him from reliably testifying in this case.

Finally, PBI argues that Finn's opinions should be excluded since their probative value is substantially outweighed by confusion of the issues. However, PBI Bank offers no exact explanation as to why Finn's testimony will confuse the jury, suggesting only that Finn's "attempt to make legal conclusions about ultimate issues are inherently confusing, especially in light of Finn's assumptions

25

that are inconsistent with the evidence." (Reply to Great Am. Ins. Co.'s Resp. to Mot. to Strike, Exclude or Limit the Op. of Great Am. Ins. Co.'s Expert [DN 101] 6.) As discussed above, Finn's opinions largely do not contain impermissible legal conclusions, and to the extent that they do (because they focus on PBI Bank and Wilcutt's mental state), the Court has remedied any confusion by striking those portions. Also, the Court will not exclude Finn's opinions simply because they are based on Great American's version of the facts and not PBI Bank's version. PBI Bank has provided no authority on-point to support such a proposition. In sum, PBI Bank has failed to meet its burden of showing that Finn's testimony will confuse the jury. The testimony will be permitted.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that PBI Bank's Motion for Summary Judgment [DN 89] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to Great American's misrepresentation claim with respect to the telephone call between McDaniel and Wilcutt. It is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that PBI Bank's Motion to Strike, Exclude or Limit the Opinion of Great American's Expert [DN 87] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to Finn's opinions regarding whether PBI Bank and Wilcutt "knowingly" created misleading bank records or "knowingly" participated in fraud. It is **DENIED** in all other respects.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

March 18, 2013

cc: counsel of record

26