UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY | ) | Case No. 1:10-cv-00161-JHM-ERG |
| | ) | ELECTRONICALLY FILED |
| PLAINTIFF | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY DEWAYNE POYNTER, ET AL | ) | |
| | ) | |
| DEFENDANTS | ) | |

| | |
|---|---|
| PBI BANK, INC., ET AL | ) |
| | ) |
| THIRD-PARTY PLAINTIFFS | ) |
| | ) |
| vs. | ) |
| | ) |
| GLASGOW INSURANCE AGENCY, INC., ET AL | ) |
| | ) |
| THIRD-PARTY DEFENDANTS | ) |

## PLAINTIFF'S, GREAT AMERICAN INSURANCE COMPANY, TRIAL BRIEF

Comes the Plaintiff, Great American Insurance Company (""Great American"), by counsel, and for its Trial Brief, states as follows:

### INTRODUCTION

Initially, this action was filed by Great American Insurance Company against Anthony DeWayne Poynter, PBI Bank Inc. and Dennis Wilcutt, Taylor, Polson & Company, PSC and John M. Taylor, III, and James and Dorothy Alexander.  Shortly after this action was filed, Anthony DeWayne Poynter filed for bankruptcy.  Great American Insurance Company filed and adversary proceeding against him in that court and obtained summary judgment against Poynter in the amount of $600,210.01.  Poynter appealed this decision to the Federal District Court and

the Sixth Circuit Court of Appeals, both of which affirmed the decision of the bankruptcy court. Therefore, at this time, Great American has a valid, non-dischargeable judgment against Poynter. In the interim, Great American Insurance Company has settled is claims against all the other Defendants with the exception of James and Dorothy Alexander.

## STATEMENT OF THE FACTS

Great American issued several bonds to Poynter Construction Company.  These bonds were issued on the basis of financial information that was provided to Great American Insurance Company, that was based on certain loan transactions involving PBI Bank and the Alexander's.

Mark McDaniel was employed by Great American in Louisville, Kentucky and made the decisions on whether to issue the bonds at issue in this case to Poynter Construction.  In the case of Poynter Construction, he initially relied primarily on the December 31, 2007 financial statement when issuing bonds because Poynter Construction was a new company beginning its start into the commercial construction business.  This financial statement indicated that Poynter Construction had $503,565.00 of cash in its bank account.  That amount included the proceeds of a loan from PBI Bank to Poynter Construction in the amount of $500,000.00.  Wilcutt, of PBI Bank, acknowledged that he was aware that $500,000.00 loan was being used to inject capital into Poynter Construction for the purpose of allowing Poynter Construction to obtain construction bonds.

After receiving and relying on the December 31, 2007 financial statement, McDaniel issued a number of bonds on behalf of Poynter Construction including the bonds on the Barren-Metcalfe County EMS project.

When McDaniel received the June 30, 2008 financial statement for Poynter Construction, he learned the $500,000.00 that had been "injected" into the Poynter Construction was no longer

- 2 -

in Poynter Construction.  McDaniel continued to issue bonds based on the condition that the $500,000.00 be put back into the company.  McDaniel believed that it would not be an issue for Poynter to place this money back into Poynter Construction, because he believed that Poynter's grandparents, the Alexander's, were backing him. That is a primary reason why McDaniel was willing to continue to issue bonds on behalf of Poynter Construction.

On November 10, 2008, McDaniel approved issuance of a bid bond for the City of Oak Grove Project on the condition that Poynter put the $500,000.00 back into Poynter Construction. McDaniel approved the final bonds on the project on or about December 1, 2008.

On December 2, 2008, McDaniel attended a meeting at which he informed Poynter and the other parties involved that based on the requested bonding requirements for Poynter Construction for 2009 that Poynter would have to capitalize Poynter Construction with $1 million.  McDaniel agreed that it was acceptable to capitalize using a loan as long as the loan was for at least a period of 13 months, it could not have a corporate guarantee on the note from Poynter Construction, the note had to be payable by Poynter personally, and the Poynter's interests in being repaid by Poynter Construction had to be subordinated to Great American's right to receive payment.

However, at that time PBI Bank knew that the loans would not be completed in that manner.  The only application prepared by Wilcutt for the December 2008 loan showed the term of the loan as being for less than a month after the loan was to be issued.  Furthermore, that money had to be placed in to the blocked account to protect the interests of the Alexander's who were acting as guarantors.  The December 2008 loan was intended to be prepared in the same manner as the December 2007 i.e. with the Alexander's guaranteeing the loan, with the proceeds placed in the blocked account, and with the proceeds used to pay off the loan.  Thus, despite

representations to McDaniel otherwise, there was never any intention to issue the loans according to the terms requested by Great American, but only on terms that would protect the interests of the Alexander's as opposed to Great American Insurance Company.

For the year-end December 31, 2008, financial statements stated that there was a long-term note payable for Poynter Construction/Poynter in the amount of $1 million and with a term of 13 months. The financial statement indicates that Poynter Construction had cash or cash equivalents in excess of $1 million. McDaniel received the December 31, 2008 financial statement on April 22, 2009 along with the promissory note from PBI indicating that Poynter had personally been provided a loan in the amount of $1 million with a maturity date of January 26, 2010. The December 31, 2008 financial statement reflected that Poynter Construction sustained a loss of about $213,008.00 during 2008 but it also reflected that there was $1,049,872.00 in cash in Poynter Construction due to the $1 million loan.

On April 20, 2009, McDaniel approved a bid bond for the Caverna Elementary Project. That bond was issued based in part on the December 31, 2007 financial statement, which indicated that Poynter had the capacity to place capital in the amount of $500,000.00 into Poynter Construction. That bond was also issued based on the representation to McDaniel that PBI could and would issue Poynter $1 million loan with a term of at least 13 months to satisfy the capital requirement for the year ending December 31, 2008. There was no indication that the loan was being placed in blocked account.

Dennis Wilcutt, of PBI Bank, had been the Alexander's loan officer for more than twenty years. The Alexander's were one of Wilcutt's and the bank's largest customers. The Alexander's introduced DeWayne Poynter to Wilcutt. Poynter asked PBI Bank for a $500,000.00 loan to get a bond for Poynter Construction. The Alexander's were the guarantors on virtually all loans

- 4 -

made by PBI Bank to Poynter. The Alexander's were told that this loan was to obtain a bond. In approving the loan, the bank was mostly concerned with whether the Alexander's were willing to guarantee the loan. Without the Alexander's guarantee, PBI Bank would not have given Poynter Construction the $500,000.00 loan. The next loan to Poynter Construction, also for bonding purposes, was for $1 million dollars. Again, PBI Bank would have refused to make this loan without the Alexander's guarantee, and having the money deposited in a blocked account. Another such loan was made in the same manner. Each time PBI made a loan to Poynter Construction, the Alexander's were consulted and they understood that the loans were being made for the purpose of obtaining bonds for Poynter Construction from Great American.

Again, without the knowledge, approval, and financial backing of the Alexander's, PBI Bank would not have made any loans to Poynter Construction. And without those loans to exaggerate and inflate Poynter Constructions' financials, Great American Insurance Company would not have issued any bonds to Poynter Construction, and thus would not have sustained any losses related to the bonds.

## LEGAL ISSUES

I.   **JAMES AND/OR DOROTHY ALEXANDER MADE FALSE STATEMENTS AND EXECUTED FALSE AND/OR MISLEADING DOCUMENTS TO MISREPRESENT POYNTER CONSTRUCTION'S FINANCIAL CONDITION TO GREAT AMERICAN'S DETRIMENT.**

Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky. *See Lappas v. Barker*, 375 S.W.2d 248, 252 (Ky. 1963)(where the court found that a party was liable for aiding and abetting fraud). In order to prove that a party aided and abetted fraud, a plaintiff must prove that a party committed fraud, that the party accused of aiding and abetting that fraud gave "substantial assistance or encouragement" to the person who committed fraud and that the person accused of aiding and abetting the fraud knew of the wrongful conduct.

- 5 -

*Miles Farm Supply, LLC v. Helena Chemical Company*, 595 F.3d 663, 666 (6th Cir. 2010).  In order to establish fraud in Kentucky, a party must prove:

> (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff.

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)).

McDaniel relied on the December 31, 2007 financial statement as the starting point for Poynter Construction's capitalization for 2008.  Thus, in issuing the bonds on the City of Oak Grove, McDaniel reasonably relied on the false statement, contained in the December 31, 2007 financial statement made possible by the sham loan from PBI, that Poynter had paid in capital in the amount $500,000.00 to Poynter Construction and that Poynter Construction had no debt to PBI.  No such sham loan would have occurred without the Alexander's guarantees.

McDaniel received the December 31, 2008 financial statement and the note for the December 31, 2008 loan to Poynter on April 22, 2009 before he issued the final bonds on the Caverna Elementary Project.  The financial statements and the note both indicated that the loan had been prepared as he requested, and at that point he had no reason to doubt that the proceeds from the loan was in Poynter Construction's account as agreed upon, because the financial statement indicated the same.  Thus, McDaniel reasonably relied upon false statements in the note and false statements in the financial statements based on the note when he issued the final bonds on the Caverna Elementary Project upon which Great American ultimately suffered a loss. Again, no such sham loan would have occurred without the Alexander's guarantees

II.     **THE ALEXANDER'S HAD KNOWLEDGE OF POYNTER'S FRAUDULENT CONDUCT TO OBTAIN THE LOANS THAT ALLOWED HIM TO MISREPRESENT HIS AND HIS COMPANIES FINANCIAL CONDITION TO THE DETRIMENT OF GREAT AMERICAN.**

In Kentucky cases involving fraud, intent and actual knowledge on the part of the party accused of fraud may be inferred from the circumstances.  *See Denzik v. Denzik*, 197 S.W.3d 108 (Ky. 2006)(where the court found evidence that a wife disavowed an affair during her divorce, that the actual father of her child had a small income at the time of the divorce, and that the wife had relations with the father more than her husband was sufficient for a jury to infer the intention to defraud and knowledge that statements regarding paternity were false); *see also White v. United States*, 20 F. Supp. 623 (W.D. Ky. 1937)("A charge of fraud cannot be sustained unless it is shown that the person charged had in his mind the intention to deceive another, but the intention may be inferred from the consequences of the act.").  Furthermore, although the issue has not been addressed in Kentucky, courts in other jurisdictions that follow Restatement (Second) of Torts § 876 in defining the claim for aiding and abetting tortious conduct, like Kentucky, have held that the knowledge of the other parties wrongful conduct may be inferred from the circumstances.  *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000)("For the purposes of establishing aiding and abetting liability, 'the requisite intent and knowledge may be shown by circumstantial evidence.'")(quoting *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir. 1985)); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)("Proof of a defendant's knowledge or intent will often be inferential[.]").  Thus, an actual confession of knowledge is not required to establish knowledge of the fraud, as circumstantial evidence indicating knowledge is sufficient.

There is substantial evidence of the Alexander's knowledge of the fraud.  First, the loan documents indicate that the loans in question were being given for bonding purposes and the Alexander's knew that the loans were being used to obtain bonds.  The Alexander's were large customers of the bank. Although the note indicated a term of 13 months, the Alexander's were aware the loan was only being made for just a few days and that the loans would be placed into a blocked account to which Poynter would have no actual access.   Most important, had the Alexander's not participated in these acts, by actively guaranteeing each and every "loan" that was issued to Poynter, no such loans would have been issued.  Thus, a reasonable jury could infer that the Alexander's knew that Poynter was engaging and wrongful and tortious conduct, and actively participated in this conduct.

### III.    THE ALEXANDER'S PROVIDED SUBSTANTIAL ASSISTANCE TO POYNTER TO EMBELLISH HIS FINANCIALS, TO THE DETRIMENT OF GREAT AMERICAN.

As used in the Restatement (Second) of Torts § 876, which Kentucky has adopted, "substantial assistance" means that an aider and abettor's conduct was a substantial factor in causing the tort.  When analyzing what constituted substantial assistance in *Aetna Casualty and Surety Company v. Leahey Constr. Co. Inc.*, 219 F.3d 519 at 537, (6th Cir. 2000) the Six Circuit stated:

> With respect to this determination, the Third Circuit has explained as follows:
>
> > The comments to section 876 of the Restatement provide a list of five factors: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Additionally, the court in Halberstam provided a sixth factor, the duration of the assistance provided. Finally, the alleged substantial assistance must be the proximate cause of plaintiffs' harm.

- 8 -

*Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.*, 113 F.3d 1484, 1495 (8th Cir. 1997) (citations omitted).

In light of these factors, there can be little doubt that KeyBank's $275,000 loan substantially assisted Leahey in his efforts to temporarily inflate the assets of LGC&M and induce Travelers to bond LGC&M's construction projects. As discussed in Part II.A.4.a. of this opinion, Leahey's fraud consisted of the wrongful manipulation of LGC&M's financial position. By securing the $ 275,000 loan, Leahey was able to "verify" to Travelers that he had complied with its first funding request, thereby establishing a vital and initial level of credibility. Because this credibility served as the foundation for increased trust between the parties, we conclude that the extension of the loan was of substantial assistance to Leahey.

Likewise, Poynter's fraud consisted of the wrongful manipulation of Poynter Construction's financial condition. Poynter, like Leahey, would not have been unable to engage in that manipulation if the Alexander's had not guaranteed each and every loan issued by PBI Bank to Poynter and his construction company. If no such loans would have been issued, and Poynter would not have been able to fraudulently inflate his or his company's financial status. As in *Leahey Construction, Co.*, those actions allowed Poynter to "verify" to Great American that Poynter had complied with its funding requests which in turn created the financial façade that induced Great American to issue bonds.

IV.   **THE ALEXANDER'S ENGAGED IN A CIVIL CONSPIRACY TO COMMIT FRAUD WITH POYNTER BY AGREEING TO MISREPRESENT POYNTER'S FINANCIAL CONDITION.**

Great American can establish a claim civil conspiracy. Such an agreement may be inferred from the circumstances. *See Leahey Constr. Co.*, 219 F.3d at 538 (citing *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982))("Like the knowledge requirement for the tort of aiding and abetting, the existence of an express agreement between defendants will frequently be

provable only through circumstantial evidence."). There are substantial facts from which a jury could infer an agreement between the Alexander's and Poynter to commit fraud.

Specifically, PBI put the money in a blocked account such that there was never actually any credit extended. The express purpose of using this "loan mechanism" was to protect the interests of the bank's valued customers, James and Dorothy Alexander. Far from indicating only that Wilcutt and PBI knew of the fraud, those facts, which establish that Wilcutt and PBI actually made false statements in furtherance of the fraud, are sufficient to establish that PBI and Wilcutt agreed to engage in civil conspiracy.

## V.  THE ALEXANDER'S MADE NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATIONS CONCERNING POYNTER'S PERSONAL AND CORPORATE FINANCIAL STATUS.

PBI prepared a note that indicated that $500,000.00 had been loaned despite the fact that Poynter Construction never had access to the money as the bank placed it in a blocked account. Second, Wilcutt prepared the letter on January 2, 2008 verifying that Poynter had "injected" $500,000 into Poynter Construction and that Poynter Construction had no debt the day the 1 day $500,000 "loan" was paid back. Both the note and the statement were factually false – the note because it stated that the money was a loan to Poynter when in actuality it was not, and the letter because no money was actually injected into Poynter Construction. The proceeds were placed in a blocked account to which Poynter Construction had no access, and because when the letter, which was clearly designed to give the impression to Great American Insurance Company that Poynter Construction had been capitalized in the amount of $500,000, was written when Poynter Construction either had no money in its blocked account or had a debt to PBI. PBI would not have made any such loans without those loans being guaranteed by the Alexander's. Further, there is evidence that the Alexander's were kept informed by PBI, and no doubt their grandson

DeWayne Poynter, about the purpose of the loans: to obtain bonds from Great American Insurance Company.  Thus, the Alexander's knew, or should have known that Great American would receive the false information they generated regarding Poynter Construction's financial condition.  *See Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (citing Restatement (Second) of Torts § 552) (stating that either the original recipient or a person that the party knew would receive the false statement may bring a claim for negligent misrepresentation)  Thus, there is sufficient evidence to establish both that false statements regarding Poynter's financial condition were made and that the Alexander's knew that the false statements would make their way to Great American and induce it to act to issue bonds to their grandson.

With respect to the December 31, 2008 loan, similar false and misleading statements and/or documents were made or prepared.  Specifically, McDaniel was advised prior to making the December 31, 2008 loan that this loan would be made on the terms expressed by McDaniel when in fact the evidence indicates that there was no intention of ever structuring the loan in that manner.  Additionally, a false and misleading note that stated that the term of the note was 13 months was prepared when the term of the note was actually approximately one month and that indicate that the proceeds were being placed in a blocked account.  The note documents state that the note was being given for bonding purposes, and the loan needed to be in Poynter's account at year end.  Thus, again, there is sufficient evidence to establish both that false statements regarding Poynter's financial condition were made and that the Alexander's were informed of the purpose and intent of these loans knowing that the false statements would make their way to Great American and induce it to act.

With respect the City of Oak Grove bonds, the combination of the December 31, 2007 financial statement, which was based on the January 2, 2008 letter from Wilcutt, and the June 30, 2008 financial statement indicated that Poynter injected $500,000.00 into Poynter Construction and that he simply paid that money out of the company prior to June 30, 2008. Given the false impression created by the combination of those financial statements, McDaniel was willing to issue the City of Oak Grove bonds on the condition that the $500,000.00 be brought back into the Poynter Construction, because he thought it was just a matter of moving money that had been taken out of the company back into the company. Furthermore, as McDaniel indicated at his deposition, the reason he would request multiple years of financial records was so that he could establish a trend for the company to more accurately assess their financial condition. He continued to use the December 31, 2007 financial statement for that purpose, because he was never informed that the December 31, 2007 statement was false only the capital that was moved (in fact the capital never was really there but he did not know that at the time). Thus, for those reasons and for the reasons discussed more thoroughly above, Great American justifiably relied on the December 31, 2007 financial statements when it issued the City of Oak Grove bonds. The Alexander's guaranteed these loans knowing that the purpose of these machinations was to induce Great American Insurance Company to issue bonds to Poynter and/or his company.

With respect to the bonds on the Caverna Elementary project, PBI argues that Great American could not have relied on its false information with respect to the $1 million loan because it issued those bonds before it received the false information regarding the $1 million loan. However, over 4 months before the bid bonds on the Caverna Elementary project were issued, and McDaniel was advised the new loans would be prepared in the manner requested by Great American despite the Bank and the Alexander's, not actually having the intention to do so.

Furthermore, the final bonds, on which the loss actually occurred, were issued by Great American after McDaniel received the December 31, 2008 financial statement, which was based on the false bank documents, and the note prepared by PBI, which falsely represented the terms of the loan which was guaranteed by the Alexander's with full knowledge of the purpose of the loan and who would be relying on this information.  Thus, Great American justifiably relied on false information provided by the Bank and the Alexander's when it issued the bonds on the Caverna Elementary project.

**DAMAGES**

At this time Great American seeks recovery of the following damages:

Compensatory:

|   |   |   |
|---|---|---|
| 1. | Loss Payments | $786,553.17 |
| 2. | Expenses and Attorney Fees | $ 41,465.51 |

Great American reserves the right to supplement its damages at trial.

Respectfully Submitted,

*/s/ Gene F. Zipperle Jr.*
GENE F. ZIPPERLE JR.
BENJAMIN A. BELLAMY
WARD, HOCKER & THORNTON, PLLC
Hurstbourne Place, Suite 700
9300 Shelbyville Road
Louisville, Kentucky 40222
(502) 583-7012
(502) 583-7018 (Fax)
gzipperle@whtlaw.com
*Counsel for Plaintiff*
*Great American Insurance Company*

## CERTIFICATE

I hereby certify that on the 7th day of January, 2013, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF System, and the foregoing document was served electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures upon all parties in the electronic filing system in the case by electronic mail including:

Scott A. Bachert
W. Greg Harvey
Harned, Bachert & McGehee, PSC
324 East Tenth Avenue
P.O. Box 1270
Bowling Green, Kentucky 42102-1270
(270) 782-3938
(270) 781-4737 (Fax)
bachert@hbd-law.com
harvey@hbmfirm.com
*Counsel for Defendants*
*PBI Bank, Inc.*
*Dennis K. Wilcutt*

Bobby H. Richardson
Richardson, Gardner, Barrickman & Alexander
117 East Washington Street
Glasgow, Kentucky 42141
(270) 651-8884
(270) 651-3662 (Fax)
mms@rgba-law.com
*Counsel for Defendants*
*Taylor, Polson & Company, PSC*
*John M. Taylor, III, CPA*

Mark H. Flener
1143 Fairway Street, Suite 101
P. O. Box 8
Bowling Green, Kentucky 42102
(270) 783-8400
(270) 783-8872 (Fax)
mflener@bellsouth.net
*Counsel for Defendants*
*James Alexander*
*Dorothy Alexander*

Jeffrey A. Taylor
Landrum & Shouse, LLP
106 West Vine Street, Suite 800
P.O. Box 951
Lexington, Kentucky 40588-0951
(859) 255-2424, Ext. 248
(859) 233-0308 (Fax)
jtaylor@landrumshouse.com
*Counsel for Third-Party Defendants*
*Glasgow Insurance Agency, Inc.*
*Jerry Hardison*

   I further certify that a copy of the foregoing document and Notice of Electronic Filing, properly addressed and postage pre-paid, was deposited in the United States Mail to:

Anthony Dewayne Poynter
561 Brentwood
Glasgow, Kentucky 42141
*Defendant*

      */s/ Gene F. Zipperle Jr.*
      *Counsel for Plaintiff*
      *Great American Insurance Company*